MISSION PETROLEUM CARRIERS,
INC., Appellant,

v.

Roy B. SOLOMON, Appellee.

No. 09–99–533 CV.

Court of Appeals of Texas,
Beaumont.

Submitted June 15, 2000.

Delivered Feb. 22, 2001.

Cliff Harrison, Andrew M. Gilchrist, Harrison, Bettis & Staff, L.L.P., David M. Gunn, Hogan Dubose & Townsend, L.L.P., Houston, for appellant.

M. Joseph Greer, Douglas P. Greer, Greer & Greer, L.L.P., Tommy Yeates, Moore Landrey, L.L.P., Beaumont, for appellee.

Before WALKER, C.J., BURGESS and FARRIS, JJ.[1]

---

1. The Honorable David Farris, sitting by assignment pursuant to TEX. GOV'T CODE ANN. § 74.003(b) (Vernon 1998).

## OPINION

FARRIS, Justice (Retired).

The primary issues presented by this appeal involve the duty an employer owes to its employees in conducting drug screening tests. Roy Solomon sued his former employer, Mission Petroleum Carriers, Inc., complaining it negligently conducted the collection of his urine specimen during a mandatory drug test. Solomon contends that as a consequence of Mission's negligence the test of his urine produced a false result indicating the presence of marijuana. The jury found that Mission was negligent and that Solomon had incurred damages for medical care, lost earning capacity, and mental anguish. The jury also found that Mission acted with malice and assessed exemplary damages.

On appeal Mission complains (1) the judgment is void because there was a final judgment disposing of the case, (2) it had not breached a duty owed to Solomon, (3) the evidence of proximate cause was legally and factually insufficient, (4) mental anguish damages were not recoverable because of the rule in *Boyles v. Kerr*, 855 S.W.2d 593 (Tex.1993), (5) the award of medical expenses and mental anguish were not recoverable because they were the consequence of Mission lawfully firing Solomon, and (6) the evidence of malice was legally and factually insufficient. Mission has admitted it does not contest either the jury's conclusion that the evidence showed it was careless in collecting Solomon's specimen or the amount of damages the jury awarded Solomon. We overrule all of Mission's issues and affirm the judgment.

■ Mission first asserts that an earlier summary judgment was a final judgment, disposing of all issues in the case, thus the judgment on appeal was void. This assertion is based upon the summary judgment's Mother Hubbard clause, "All relief requested but not granted is denied." Mission's argument in support of issue one is grounded on *Mafrige. See Mafrige v. Ross*, 866 S.W.2d 590, 591 (Tex.1993). In a recent decision, the Supreme Court of Texas overruled *Mafrige* to the extent it held the inclusion of a Mother Hubbard clause indicated a judgment is final for purposes of appeal. *See Lehmann v. Har-Con Corp.*, —— S.W.2d ——, No. 99–0406, 2000 WL 33146410 (Tex. Feb.1, 2001) (not yet released for publication). In this case the language preceding the Mother Hubbard clause limited the scope of the summary judgment to two of the theories of recovery alleged by Solomon, defamation and business disparagement. The judgment did not actually dispose of every pending claim and party nor did it clearly and unequivocally state that it did. *Id.* at 13. Accordingly it was not final for purposes of appeal. *Id.*

In its second and third issues Mission asserts that it breached no duty owed to Solomon and that the evidence of proximate cause was legally and factually insufficient. These issues require us to examine and discuss the record.

Roy Solomon was one of 520–plus truck drivers employed by Mission Petroleum and one of approximately forty or fifty employed at Mission's Beaumont terminal. Mission's truck drivers were subject to random drug tests requiring them to give a urine specimen on demand. Despite the availability of companies that were in the business of collecting urine specimens for testing, Mission chose to use its own employees in that capacity. At the Beaumont terminal urine specimens were collected in the terminal office.

Solomon testified that, when he arrived at work on April 3, 1997, Ed Hillebrandt, Mission's Beaumont terminal manager, ordered him to provide a urine specimen for drug testing. Hillebrandt provided Solomon a beaker for that purpose. When Solomon first saw the beaker it was sitting, exposed, unsealed, on a desk. Solomon took the beaker into a restroom, ob-

tained the specimen, returned, and placed it on Hillebrandt's desk. Then Solomon returned to the restroom to wash his hands. Hillebrandt had not instructed Solomon to wash his hands before collecting the sample. Solomon did not know who may have handled the unsealed beaker before he picked it up or while he was in the restroom washing his hands.

Solomon was later told that his specimen had tested positive for marijuana and he was ultimately fired. Because of the positive test result Solomon was unable to find employment as a truck driver. Other trucking companies, that considered employing Solomon as a driver refused to employ him once they learned that Solomon had tested positive for a controlled substance. Potential employers would learn of the positive test from reports they received from Mission disclosing that Solomon had tested positive for a controlled substance. These disclosures were requested by a potential employer and provided by Mission pursuant to Department of Transportation regulations. *See* 49 C.F.R. §§ 382.405(f) & 382.413(a)(1)(ii) (1999). Also when asked why he had left Mission, Solomon would tell them he had failed a drug test.

Solomon insists that he has never used marijuana. Two co-employees at Mission testified that they had never heard of Solomon doing so. Both a psychiatrist and a therapist who treated Solomon for depression did not find Solomon to possess any of the characteristics that they associated with drug abusers.

Hillebrandt's testimony disputed much of Solomon's testimony about the urine collection. His testimony in that regard was primarily based upon his recollection of how he always conducted a specimen collection. Hillebrandt testified that his training as a specimen collector involved a small book, a prepared manual, and two videos. Hillebrandt had worked nineteen years in the trucking industry, for several companies. Of those companies, only Mission did its own drug testing rather than

sending its employees to a clinic. Hillebrandt was shocked that Solomon tested positive for marijuana. Hillebrandt admitted that he had received a ten year deferred adjudication for an unspecified offense and that he was subject to random drug testing by his probation officer.

Merle Esprit, who had worked at Mission's Beaumont terminal as a dispatcher and assistant manager corroborated Solomon's testimony while disputing that of Hillebrandt. Esprit testified that it was his job at Mission to collect some of the urine specimens. According to Esprit the only training he received at Mission was from a secretary who never told him that it was important to have the employee wash his hands before collecting a specimen, to keep the test kit sealed until the employee was present, or to keep the collected specimen in the employee's view until the collection was complete. Esprit testified that a test kit would normally be opened before the employee came in to the office so the collector could begin filling out the paper work that was located in the bag. Esprit described the dispatcher's office, where the test kits were opened and given to the employees, as a busy place with the phone constantly ringing and people going in and out. The restroom where employees were sent to collect urine specimens was used by all of the terminal employees and was cleaned only twice a week.

Another former employee, Gregg Brown, testified that he too had worked as a dispatcher at the Beaumont terminal and that he too had been responsible for collecting urine samples. Brown was trained by the same secretary that trained Esprit. According to Brown the secretary instructed him to, " . . . basically take the specimen, get him to sign the paper and, you know, and package it up." There was only one bathroom at the terminal and everyone used it. Brown admitted that while he was at Mission he had improperly collected specimens that were sent to the lab for testing.

Joe Clark, who owned a urine specimen collection business testified that there were at least a dozen such businesses in Beaumont. Some would go to the employment site to make collections. Clark testified that it was important that an employee wash his hands to avoid contaminating the urine sample. The sample kit should remain sealed to ensure that the specimen bottle was not contaminated. And a break in the chain of custody would invalidate the entire test.

After Mission fired him, Solomon's attorney arranged for Solomon to collect a hair sample and submit it for testing. The laboratory that tested the hair sample reported a negative test result for the presence of marijuana or any other controlled substance.

Dr. Gary Wimbish, a board certified forensic toxicologist, called as a witness by Solomon, testified the scientific community, the American Academy of Forensic Scientists, and the Society of Forensic Toxicologists all recognized hair sample testing. He testified that hair test sampling was used by the FBI and other law enforcement agencies and admitted into evidence in state and federal courts. He explained that hair carries with it the components of the blood stream that are present when the hair develops. He testified that if a person uses controlled substances those substances will be incorporated into the hair at the time of use, and there will be a pattern that will occur in the hair depending on those occasions of use related to the growth of the hair. He testified that a hair sample test would disclose if one was a regular user of marijuana but that one isolated use might not appear in concentrations sufficient to be detected.

Dr. Wimbish vouched for the collection and testing of Solomon's hair sample. He testified that the test confirmed that Solomon's hair sample contained no THC active ingredient of marijuana or its metabolite, carboxy THC. And he testified that if Solomon had a life style of marijuana use at the time Mission took his urine sample it would have been evident from the hair sample. But he also testified that he could not say Solomon had not smoked marijuana at the approximate time Solomon's urine sample was collected by Mission.

Dr. Wimbish also addressed the Department of Transportation regulations regarding the collection, transportation, and testing of urine samples. See 49 C.F.R. §§ 40.23–40.25 (1999). He described those regulations as safeguards. If the regulations were not followed either the collection or the test should be voided and a recollection ordered.

49 C.F.R. §§ 40.23–40.25 mandates minimum standards for collection and testing of urine samples beginning with the preparation for testing. Among other things these regulations require the use of a clean, single-use specimen bottle or collection container that is securely wrapped until filled with the specimen. See § 40.23(b)(1). The specimen bottle or the collection container shall be provided to the employee still sealed in its wrapper or unwrapped in the employee's presence immediately before use. Id. The regulations also provide for a designated collection site that is to be secure in order to prevent unauthorized access which could compromise the integrity of the collection process or the specimen. See § 40.25(b). The regulations mandate that the collection site person shall receive training that clearly emphasizes that he or she is responsible for maintaining the integrity of the specimen collection and shall demonstrate proficiency before serving in that capacity unless he or she is a medical professional, technologist, or technician licensed or otherwise approved to practice in the jurisdiction where the specimen is taken. See § 40.23(d)(1) & (2). Unless it is impracticable for any other individual to perform that function a direct supervisor of the employee shall not serve as the collection site person. See § 40.23(d)(3). The regulations also require that the employee be instructed to wash and dry his or her hands prior to urination. See § 40.25(f)(5).

And both the individual being tested and the collection site person are to keep the specimen in view at all times prior to its being sealed. *See* § 40.25(f)(17).

Dr. Wimbish testified that, under the Department of Transportation protocols, the integrity of the urine sample was the responsibility of the collector. Dr. Wimbish testified that he had trained the medical review officer who had tested Solomon's urine sample after it was submitted by Mission, and Wimbish expressed his confidence that the medical review officer would have invalidated the test if he had known of Mission's failure to follow these protocols. Dr. Wimbish testified that the failure to comply with these protocols removed the certainty that the specimen sent to the lab was Solomon's.

Dr. Wimbish testified that, given the availability of other specimen collection sites it would be practical for Mission to send its workers to those sites, and that it was a violation of the DOT regulations for Hillebrandt, as Solomon's supervisor, to collect the sample. Dr. Wimbish testified that it was unacceptable for the collector to be a person who was on probation and subject to random drug tests by his probation officer. Dr. Wimbish testified that providing Solomon with a beaker that was unwrapped violated DOT regulations and created a potential for contamination. Dr. Wimbish testified that it was important that Solomon remain in the office, rather than returning to the restroom to wash his hands, so that he could validate that the specimen was his.

Roy Acton, Mission's director of safety, testified that Mission was subject to the DOT regulations and that it was important for him to be knowledgeable about the regulations that applied to specimen collection. Acton admitted that he was aware that outside specimen collectors were available in Beaumont. Acton conceded that not keeping the specimen bottle sealed or breaking the chain of custody by not keeping the sample in view of the tested employee or employing improper personnel as a specimen collector would invalidate the test. Acton testified that Mission paid approximately $25.00 to send off a specimen collected by its employees and speculated that sending an employee to an independent lab would double the costs.

■ In issue two Mission insists that it owed Solomon no duty under the law of negligence. The existence of a duty is a question of law for the court to decide. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). Before determining that a duty exists a court must consider the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, and the magnitude of the burden of guarding against the injury and the consequences of placing the burden on the actor. *Id.; Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983). Mission argues there is no issue of duty in this case because Solomon complained of conduct that would allow recovery for damages only under theories of breach of contract or defamation and not negligence. Mission then intertwines several reasons why Solomon cannot, as a matter of law, recover under either theory.

Mission's arguments fail because Solomon did not complain that Mission negligently fired him or otherwise breached a contract of employment or that Mission negligently published the test results of his urine test. Instead Solomon complained that Mission negligently collected his specimen and that he has suffered damages as a consequence of that negligence. Solomon's damages were not the subject matter of his contract of employment. *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex.1991). Solomon claimed and offered proof that he suffered a loss of earning capacity caused by his inability to continue working as a truck driver. Nor is this a case of self-defamation. Department of Transportation regulations compelled the disclosure that Solomon had tested positive for a controlled substance. Those regulations,

requiring a new employer seek that information, necessarily required that Solomon consent to the disclosure of the failed test.

■ Every person has a duty to exercise reasonable care to avoid a foreseeable injury to others. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). Generally, one has a duty to act when by its own act it creates a danger. *See Buchanan v. Rose,* 138 Tex. 390, 159 S.W.2d 109, 110 (1942). In this instance Mission created a danger when it chose to use its employees to collect urine specimens rather than using one of the several laboratories that were available. Having made that choice it was obligated to act so that it did not injure the employees who were compelled to submit to testing. Given Acton's testimony acknowledging that the DOT protocols applied to Mission's collection of specimens, Mission should have reasonably anticipated that failing to follow them created a risk of injury. Hillebrandt testified that he was acquainted with those protocols, but his testimony that he followed them was refuted by the testimony of Solomon, Esprit, and Brown. After considering each of the factors listed above we conclude that Mission owed its employees a duty to use reasonable care in the collection of urine samples for drug testing.

■ In issue three Mission challenges the legal and factual sufficiency of the evidence of proximate cause focusing on Solomon's failure to offer evidence explaining how the specimen became contaminated. In support of its challenge Mission compares this case with another in which this Court refused to engage in "serious inference-stacking" when the court could find "no evidence, either direct or reasonably inferable," to support a necessary element of the State's burden of proof in a criminal case. *See Sestric v. State,* 1 S.W.3d 921, 927–28 (Tex.App.—Beaumont 1999, no pet.). Importantly, the State's burden of proof beyond a reasonable doubt was not the same burden that was borne by Solomon.

■ Solomon was only required to convince the jury by a preponderance of the evidence that his urine specimen was contaminated by Mission's negligence and not to exclude the possibility of some other source of the contamination. *See Farley v. M M Cattle Co.,* 529 S.W.2d 751, 755 (Tex. 1975); *Renfro Drug Co. v. Lewis,* 149 Tex. 507, 235 S.W.2d 609, 621 (1950). The evidence supported competing inferences; either Solomon had used marijuana or the specimen was contaminated. There was evidence that the contamination occurred because Hillebrandt did not follow the DOT mandated protocols to protect against contamination. The evidence supporting the verdict was more than a scintilla. *See Formosa Plastics Corp. v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). And after considering all of the evidence we are unable to conclude that the verdict was so against the great weight and preponderance of the evidence as to be clearly unjust. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986)(op. on reh'g).

■ In issue five Mission contends that the awards of mental anguish damages and medical expenses were improper because those damages were a consequence of Mission firing Solomon. Mission bases its contention on testimony by Solomon's physician and his professional counselor attributing his mental anguish and need for treatment to his "firing" and loss of his job.

Taken in the context of his entire testimony, it is evident that the physician considered the cause of Solomon's injuries to be his inability to continue working as a truck driver. The physician testified that he did not recall whether or not Solomon had been fired but that Solomon was reacting to an impression that his life was ruined because he could not get any other job of the same caliber as that he had at Mission. While the counselor described the "loss of his job" as the cause of Solomon's depression, other testimony stated

Solomon's was not the normal reaction to being fired but was related to his desire to continue as a truck driver. Solomon testified his inability to get other truck-driving jobs was caused by the positive drug test and attributed his problems to an inability to support himself and pay his child support. We conclude there is evidence that Solomon's mental anguish and related medical expense was caused by his inability to regain employment as a truck driver and overrule issue five.

■ In issue four Mission complains that mental anguish damages were not legally recoverable and that their award in this case violated the rule of *Boyles v. Kerr,* 855 S.W.2d 593 (Tex.1993). Mission characterizes this issue as involving an award of mental anguish damages in a case alleging a loss of a job. As we have pointed out, Solomon complains not of losing his job but of lost earning capacity. The question we must address is whether or not Mission's conduct and the consequential loss of earning capacity can give rise to damages for mental anguish. We conclude that they can.

We reach this conclusion after considering both the wrong and its consequences. As we noted in addressing Mission's second issue, it elected to use its employees to collect specimens rather than to employ any of several reasonably available labs. Mission understood the risk it took by this undertaking. There is considerable evidence that, despite its knowledge of the risks, Mission cavalierly disregarded the DOT protocols. And the injury Solomon suffered as a consequence, an inability to find work as a truck driver, was obvious to Mission.

■ Finally, in reaching this conclusion we are mindful the Supreme Court has provided a framework describing the categories of cases in which mental anguish traditionally has been compensable: intentional torts, cases involving a special relationship, cases of serious bodily injury, and cases involving injuries so shocking that mental anguish is a highly foreseeable result. *See City of Tyler v. Likes,* 962 S.W.2d 489, 495–96 (Tex.1997). But we conclude that the nature of the wrong coupled with the injury arguably places this case within all but the first of those categories. And even if the facts presented here cannot be shoe-horned into one of those convenient categories they present a case easily distinguished from cases involving injury to or loss of property, breach of contract, negligent misrepresentation, insurance code violations, or DTPA cases. *Id.* at 497–98.

■ In its sixth issue Mission challenges the legal and factual sufficiency of the evidence to sustain the award of punitive damages. The question of punitive damages was conditioned on a finding of malice. Malice was submitted in a question requiring the jury to find either a specific intent to injure Solomon or a *Moriel* finding of an act or omission involving an extreme degree of risk, considering the probability and magnitude of the potential harm to others of which Mission had actual, subjective awareness of the risk involved. *See Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex.1994). Punitive damage awards must be supported by clear and convincing evidence. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.003 (Vernon 1997).

Solomon argues that the award of punitive damages should be sustained because there is clear and convincing evidence of malice. There is no evidence suggesting any specific intent to cause injury. But there is evidence that Mission was actually aware of an extreme risk of serious harm. *Cf. Moriel,* 879 S.W.2d at 25–26. There is ample evidence that Mission did not properly train its employees in the collection and handling of urine specimens and that those collections were routinely mishandled. As the evidence noted above indicates, there is evidence that Mission knew its omissions created the risk of harm to its truck drivers and that Mission did not care. *See Louisiana–Pacific Corp. v. An-*

*drade,* 19 S.W.3d 245, 246–47 (Tex.1999). Accordingly, we overrule issue six.

The judgment of the trial court is AFFIRMED.