**TEXAS FARM BUREAU INSURANCE COMPANIES, Appellant,**

v.

**James SEARS, et ux., Appellees.**

**No. 10–00–050–CV.**

Court of Appeals of Texas, Waco.

July 25, 2001.

---

Linda K. McCloud, Beck, Redden & Secrest, Houston, Brent Howard, Howard & Davis, Tyler, Sherwin A. Winniford, Fulbright, Winniford & Marable, Waco, for appellant.

Ron Adkinson, Wellborn, Houston, Adkison, Mann, Sadler & Hill, Henderson, for appellee.

Before Justices VANCE, GRAY, and CUMMINGS.

## OPINION

VANCE, Justice.

In 1983, James Sears was an insurance agent for Texas Farm Bureau Insurance Companies ("Farm Bureau" or the "company") in its Nacogdoches office, which was managed by Joe Sweat. Sears reported to Sweat that he suspected irregularities in how claims were being processed in the office. The allegations were that a local contractor, Mickey Walker, would inflate bids on repairs for property damage which would then be approved by Farm Bureau's adjuster, Don Lackey, for a "kickback." Some agents may also have been involved peripherally. Sears and Sweat reported the allegations to the main office in Waco. No action was taken by Farm Bureau. Over the next several years Sears made some other reports about the scheme, one to another superior, Ronnie Worth, and later to the district manager, Lewis Rix. Still, no action was taken by Farm Bureau.

In 1990, when Sears was recuperating from hip surgery and working only part-time, an insured of Farm Bureau, later identified as one of Sears's clients, sent an anonymous letter to the company, with a copy to the Texas Department of Insurance, describing the "kickback" scheme and accusing Walker, Lackey, and Sears of being involved in it. Farm Bureau had one of its internal auditors, Darren Callaway, review Sears's files, and he found a few to be suspicious. The company began an investigation of the Nacogdoches office, hiring an out-of-state investigator, Bill Graham. Graham was aided by Callaway. Sears later claimed that Farm Bureau gave Graham no parameters within which to conduct his investigation, but simply "unleashed" him on Sears and others. Sears also claimed Graham targeted him and used unethical tactics. For example, when Sears arrived at the office for his first investigatory interview with Graham, two police officers were waiting to speak with Sears. Graham later told Sears that the police believed Sears was involved in criminal activity. Evidently that was untrue.

Although he found no "direct" evidence linking Sears to the scheme, Graham continued to identify Sears to Farm Bureau as being involved in the scheme, at least in part because evidence indicated that Sears recently had suspicious dealings with

Walker regarding two inflated bids. As a result of reports to the company from Graham and Callaway, Sears was fired on October 1, 1990. However, accusations about Sears continued. Farm Bureau made the results of its investigation of Sears available to the Texas Board of Insurance, the United States Postal Service, the United States Attorney's Office, the Internal Revenue Service, and various other federal agencies. Months after Sears's termination, Graham or Callaway had Walker, the contractor involved in the "kickback" scheme, prepare an IRS Form 1099 listing the amount of money Sears supposedly took from "kickbacks." The insinuation was that Sears had never reported this as income or paid taxes on it. The IRS eventually contacted Sears for an explanation. Finally, also months after Sears's termination, Farm Bureau sent Graham and Callaway to Austin to convince the Board of Insurance to revoke Sears's license to sell insurance. The Board refused.

Eventually Lackey and Walker were indicted for mail fraud; Walker was convicted and incarcerated. Two other insurance agents in the Nacogdoches office admitted to taking "kickbacks" and were fired.

In 1993, Sears and his wife, Sue, sued Sweat, Rix, and Farm Bureau. Their pleadings asserted claims of defamation, negligent investigation with gross negligence, negligent and intentional infliction of emotional distress, and wrongful discharge. They sought actual damages and exemplary damages connected to the emotional distress claim. The defendants filed motions for summary judgment which were granted regarding all claims against Sweat and Rix, and regarding claims for defamation, negligent infliction of emotional distress, and wrongful discharge against the company. The claims for negligent

and grossly negligent investigation and for intentional infliction of emotional distress with exemplary damages were tried to a jury in September of 1999. After a four-day trial, the jury found in Sears's favor and awarded:

- $150,000 for Sears's past mental anguish due to Farm Bureau's negligent investigation;
- $324,000 for Sears's past loss of pecuniary income due to the negligent investigation;
- $500,000 in exemplary damages due to Farm Bureau's gross negligence;
- $100,000 for Sears's emotional distress intentionally caused by the company; and
- $250,000 in exemplary damages due to the company's conduct in intentionally inflicting emotional distress on Sears.[1]

Judgment was entered in November 1999 in favor of the Searses and against Farm Bureau for $574,000 in compensatory damages and $750,000 in punitive damages, $943,486.03 in prejudgment interest, and postjudgment interest at the rate of 10% per year.

Farm Bureau makes a variety of complaints on appeal which can be grouped as follows:

1. Negligent Investigation:
 a. The company had no duty to Sears to investigate using ordinary care, and therefore as a matter of law cannot have been negligent or grossly negligent in its investigation of Sears.
 b. The evidence is legally and factually insufficient that the company negligently investigated Sears.
 c. The evidence is legally and factually insufficient that the company

---

**1.** The jury found no liability issues in Sue's favor, and did not award her damages.

was grossly negligent in its investigation of Sears.

2. The evidence is legally and factually insufficient to support any award for past mental anguish.

3. The evidence is legally and factually insufficient to support any award for past loss of pecuniary income.

4. The evidence is legally insufficient that the company intentionally inflicted emotional distress on Sears.

We will sustain the challenge to the negligence and gross negligence claims and overrule the challenge to the claim based on intentional infliction of emotional distress. Thus, we will reverse the judgment as to the negligence claims, sever them, and remand those claims for a new trial. We will affirm the judgment as to the intentional-infliction-of-emotional-distress claim.

## NEGLIGENT INVESTIGATION

Farm Bureau attacks both the basis for liability and the damages awarded.

### The Legal Duty to Investigate Using Reasonable Care

■ The company initially complains that it had no duty to use reasonable care in its investigation, and therefore, as a matter of law, it cannot have been either negligent or grossly negligent. Sears claims that he was fired because the company conducted a poor investigation, and that if the investigation had been done with reasonable care, he would have been exonerated, not fired, and not damaged.

■ It is true there is no duty of good faith and fair dealing between an employer and an at-will employee. The Legislature has enacted a variety of statutes to regulate employment relationships, and a common-law tort for good faith and fair dealing would "tend to subvert those statutory schemes by allowing employees to make an end-run around the procedural requirements and specific remedies the existing statutes establish." *City of Midland v. O'Bryant,* 18 S.W.3d 209, 216 (Tex.2000). The parties agree that Sears was either an at-will employee or agent of the company, and so the rule in *City of Midland* applies. However, the statutes do not address a person in Sears's situation in which a negligently conducted investigation could result in the loss of a job. Therefore, an employer (or principal) may have a duty of ordinary care in a "negligence" context in conducting an investigation upon which an employee's job depends.

■ Sears relies on the rule at common law that when a party voluntarily undertakes an affirmative course of action for the benefit of another party, the actor has a duty of reasonable care not to injure the other party's person or property. *Colonial Sav. Ass'n v. Taylor,* 544 S.W.2d 116, 119–20 (Tex.1976); *Otis Engineering Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983); *Klager v. Worthing,* 966 S.W.2d 77, 82–3 (Tex.App.—San Antonio 1996, no writ). The tort dates back to as early as 1922. *Fox v. Dallas Hotel Co.,* 111 Tex. 461, 240 S.W. 517, 520–21 (1922). Sometimes called a "negligent undertaking," the tort frequently arises in a "good Samaritan" context. It was most recently discussed by the Texas Supreme Court in *Torrington Co. v. Stutzman,* in which the court stated that the jury charge should include instructions that: (1) the defendant gratuitously or for compensation undertook to perform services that it knew or should have known were necessary for the plaintiff's protection, (2) the defendant failed to exercise reasonable care in performing those services, and (3) either the plaintiff relied on the defendant's performance, or the defendant's performance increased the plaintiff's risk of harm. 46 S.W.3d 829,

2000 WL 1862923, *6 (Tex. December 21, 2000).

The tort bears a similarity to section 323 of the Restatement of Torts, which reads:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 323 (1965). However, we do not find that the Texas Supreme Court has ever expressly adopted section 323. *See, e.g., Colonial Sav. Ass'n,* 544 S.W.2d at 119–20; *Torrington Co.,* 46 S.W.3d 829, 837-838; *contra Kramer v. Lewisville Memorial Hosp.,* 858 S.W.2d 397, 405 (Tex.1993). The parties have discussed section 323 as though it may apply in this case. However, we believe the tort potentially applicable here is common law "negligent undertaking" as described in *Colonial Sav. Ass'n* and *Otis Engineering Corp.*

The facts of this case do not fit the elements of "negligent undertaking" as expressed in *Colonial Sav. Ass'n* and *Otis Engineering Corp.,* or for that matter, section 323. Under either the common law rule or section 323, liability arises when the actor undertakes a particular course of action *for the benefit of another party.* Farm Bureau did not undertake its investigation to benefit Sears. The evidence shows Sears was suspected of wrongdoing. The company was attempting to determine if that was true, not for Sears's benefit, but for the company's. In addition, the investigation was not truly "voluntary." If the company had not investigated, and in-

sureds had continued to be harmed, it may have breached a duty of good faith and fair dealing to its insureds. The company was in a sense obligated to investigate. *See Wal-Mart Stores, Inc. v. Lane,* 31 S.W.3d 282, 293–94 (Tex.App.—Corpus Christi 2000, pet. denied) (Wal Mart had an affirmative duty to investigate in order to prevent and correct sexual harassment.). Alternatively, even if the elements "fit" the evidence, the jury was not charged with the elements of "negligent undertaking" or section 323, but rather with the elements of ordinary negligence. Therefore, the jury's answers will not support a judgment for a "negligent undertaking" or under section 323.

 Sears also relies on "ordinary" negligence, *i.e.,* the general duty a person has to avoid negligent conduct. "Liability in negligence is premised on a finding of a duty [of reasonable care], a breach of that duty which proximately causes injuries, and damages resulting from that breach." *Bird v. W.C.W.,* 868 S.W.2d 767, 769 (Tex. 1994) (citing *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex. 1990)); *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). Whether a duty exists is a question of law, to be decided by the court from the facts specific to the occurrence in question. *Greater Houston Transp.,* 801 S.W.2d at 525. The question is answered by considering the risk, foreseeability, and likelihood of injury from the conduct, and weighing that against the social utility of the conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the actor. *Bird,* 868 S.W.2d at 769; *Otis Engineering Corp.,* 668 S.W.2d at 309. Of all of these, "foreseeability" is the "foremost and dominant consideration." *Greater Houston Transp.,* 801 S.W.2d at 525 (citing *El Chico,* 732 S.W.2d at 311). Sears would have

us find a duty of reasonable care when Farm Bureau undertook an investigation into his alleged work-related misconduct.[2]

Applying the *Bird* test, we first consider the risk, foreseeability, and likelihood of injury to Sears from the investigation. These factors weigh heavily in Sears's favor, because it was highly foreseeable, and likely, that if the investigation unjustly implicated Sears in the "kickback" scheme, he would be fired, his reputation would be damaged so that he could not gain other employment in the insurance field, and he would suffer financial ruin, to name a few.

But these factors must be weighed against the social utility of the investigation, the magnitude of the burden of guarding against the injury to Sears, and the consequences of placing that burden on the company. "Social utility" weighs in favor of Farm Bureau. Society is protected when insurance companies police their own employees and procedures to guard against fraud and wrongdoing. Theoretically, insurance premiums are lowered, and insureds have peace of mind in relying on their insurer's integrity. Imposing a common law duty might discourage some employers from conducting investigations.

However, we do not believe the steps a party in the company's circumstances might need to take to guard against an inadequate or improper investigation are overly burdensome, or that there would be egregious consequences of placing that burden on such a party. The company controlled who it hired and assigned to conduct the investigation, the subject matter and scope of the investigation, and the manner in which the results of the investigation were used. Given that so much was easily within its control, the company cannot complain that it would be unreasonable to place a duty of reasonable care on the company regarding the investigation.

Weighing all these factors, we find that Farm Bureau had a duty to Sears to use reasonable care in conducting the investigation.

The Corpus Christi court has recently issued two opinions in which it found no duty in the employer-employee context. In *Wal-Mart Stores, Inc.*, 31 S.W.3d at 294, the court held that there is no duty under ordinary negligence regarding the conduct of an investigation into sexual harassment in the workplace. In *Garcia v. Allen*, 28 S.W.3d 587, 591–92 (Tex. App.—Corpus Christi 2000, pet. denied), the court held that an employer has no duty to investigate the accuracy of information about an at-will employee which was the basis of the employee's firing. However, both of these cases are distinguishable. In *Wal-Mart Stores, Inc.*, statutes supplement Wal Mart's efforts thereby invoking the concerns in *City of Midland* that common law torts not be created regarding situations the legislature has addressed. In *Garcia*, the issue was whether there was a duty to investigate at all, not whether there was a duty to properly conduct an undertaken investigation. Therefore, because of our *Bird* analysis, we will proceed with the resolution of Farm Bureau's other complaints.

### Sufficiency of the Evidence

The jury was asked, "Did the negligent investigation of James Sears, if any, by Farm Bureau proximately cause Mr. Sears' injury, if any?" The answer was "yes." Conditioned on an affirmative answer to that question, the jury was also

---

**2.** *Compare Mission Petroleum Carriers, Inc. v. Solomon,* 37 S.W.3d 482, 488 (Tex.App.—Beaumont 2001, no pet.) (when an employer chose to use its own personnel and procedures to collect urine samples for drug testing instead of using the services of a private laboratory, the employer had a duty of reasonable care over how the samples were collected).

asked, "Was the negligence of Farm Bureau 'gross negligence'?" The answer to the latter question was also "yes." Based on these answers, the jury awarded both actual and exemplary damages. The company complains that the evidence is legally and factually insufficient to support these findings.[3]

### Standards of Review

■ When we conduct a review of whether the evidence is legally sufficient, we consider only that evidence and the inferences therefrom which support the jury's finding, in the light most favorable to the finding, and disregard contrary evidence and inferences. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). We will find the evidence legally insufficient if: (1) there is a complete absence of evidence for the finding, (2) there is evidence to support the finding, but rules of law or evidence bar the court from giving any weight to the evidence, (3) there is no more than a mere scintilla of evidence to support the finding, or (4) the evidence conclusively establishes the opposite of the finding. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 362–63 (1960)). "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome,* 907 S.W.2d at 499 (quot-

ing *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)).

■ To determine whether the evidence is factually sufficient, we consider all the evidence in the record both for and against the jury's finding and can find the evidence factually insufficient only if we conclude that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). However, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998) (citing *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986)). If we find the evidence to be factually sufficient, we are not required to detail all the evidence supporting the finding; if we find the evidence to be factually insufficient, we must detail all the evidence relevant to the issue and clearly state why the jury's finding is so against the great weight and preponderance of the evidence that it is manifestly unjust. *Maritime Overseas,* 971 S.W.2d at 407 (citing *Ellis County State Bank v. Keever,* 888 S.W.2d 790, 794 (Tex.1994)).

### Analysis

To prevail, Sears must show that Farm Bureau's investigation fell below a level of "ordinary care," which was defined in the charge as "that degree of care that an insurance company of ordinary prudence would use under the same or similar circumstances."[4] Sears points to the following evidence to support this claim:

---

**3.** In arguing these points, Farm Bureau stresses its position that Sears was not fired because of the investigation, but for other reasons. Thus, we have some difficulty in understanding whether its attack is against the negligence component of the finding or

the causation component. Out of an abundance of caution, we will address both in our factual sufficiency review.

**4.** Farm Bureau complains that the jury was charged with the wrong standard of care, and

- When Graham began his investigation in Nacogdoches, he contacted the chief of police and inquired about several people he suspected of being involved in the "kickback" scheme, but he did not ask about Sears.
- The inconsistency between Sears being a part of the "kickback" scheme and yet having "blown the whistle" on the scheme in 1983 and thereafter was not sufficiently considered during the investigation.
- There were inconsistencies in the investigation reports which were not sufficiently considered by management before firing Sears.
- The company failed to properly supervise Graham.
- The motives of one of Sears's accusers in the investigation, Mickey Walker, to lie was not sufficiently considered during the investigation.
- Graham never asked Joe Sweat what he thought of Sears.

For legal sufficiency, we review for whether the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions" about whether the company was negligent in its investigation. *Burroughs Wellcome*, 907 S.W.2d at 499.

Sears points out that Graham did not ask the Nacogdoches chief of police about Sears when Graham first contacted the chief about people who might be involved in the "kickback" scheme. While it might have been more thorough to ask about Sears, Graham was merely collecting preliminary information at that point in the investigation. On the other hand, because Sears was one of three people accused in the anonymous letter which started the

investigation, a reasonable inference is that the omission was deliberate.

Sears believes that more weight should have been given to the fact he "blew the whistle" on the "kickback" scheme in 1983 and thereafter, because that is inconsistent with his being part of the scheme. The investigation covered the years up until 1990. From the point of view of the investigation, perhaps Sears was not a part of the scheme in 1983, but by 1990 had become involved. Therefore, his "whistle-blowing" was not important. However, it also appears that Sears's "whistleblowing" is a factor which normally would be given much weight.

Sears says there were inconsistencies in the investigation reports which were not considered by management. Over the months of the investigation numerous reports were generated based on interviews with many people. We find nothing unusual about there being inconsistencies in the reports. However, the existence of those inconsistencies should have been considered by management.

Sears points to evidence that the company failed to properly supervise Graham. Graham was a professional investigator specifically brought in from out-of-state because he was a specialist at investigating insurance fraud. It would not be unusual for the company to take a "hands-off" approach in dealing with him. At the same time, the company had the authority to supervise Graham to achieve the type and quality of investigation that it contracted for.

Sears asserts that the motives of one of Sears's accusers in the investigation, Mickey Walker, to lie was not sufficiently considered during the investigation. Howev-

a more stringent one should have been used. However, because we reverse, this complaint is moot.

er, Walker was not interviewed (because he was under threat of indictment) until after Sears was fired, and so whatever Walker said had no bearing on whether the investigation was negligently conducted. Therefore, as related to Sears, this cannot be evidence that the investigation fell below a standard of "ordinary prudence."

Finally, Sears says Graham never asked Joe Sweat what he thought of Sears. If true, there could be many reasons for this. For example, perhaps Sweat's answer was considered to be predictable since he and Sears had worked together for many years. Nevertheless, as Sears's long-time supervisor, it is logical that Sweat would have been questioned about Sears.

None of these facts alone constitute legally sufficient evidence. However, taken as a whole, "reasonable and fair-minded people" could differ in their conclusions about whether the investigation was negligently conducted. *Id.* Therefore, we find the evidence legally sufficient to support the jury's finding as to negligence.

▆ Farm Bureau also asserts a factual insufficiency claim. We note that Sears was not entitled to a perfect investigation, or even to an investigation of high quality. The definition given the jury was that the investigation had to be conducted with "that degree of care that an insurance company of ordinary prudence would use under the same or similar circumstances." We will review the evidence just recited supporting legal sufficiency, adding to it all the evidence contrary to a finding of negligent investigation.

We do not find that the evidence supporting legal sufficiency alone is sufficient to constitute factual sufficiency. It is no more than some evidence that the investigation may have fallen below a standard of "ordinary prudence." In addition, when the evidence produced by the company is also considered (*e.g.,* its explanation that Sears was fired for being involved in two fraudulent-claims incidents also involving Walker, which refutes "proximate cause," *i.e.,* if the investigation was negligently conducted, that caused Sears to be fired), it becomes clear that the jury's finding "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain,* 709 S.W.2d at 176. This conclusion is further supported by evidence that: (1) Sears may have filed false income tax returns for years misstating his business deductions, (2) when the investigation began, Walker and Lackey called Sears to find out what was happening, (3) the investigation continued for months, which supports an inference that the investigation was thorough, (4) Sears, as an at-will employee, could be fired for any reason (unless statutorily prohibited) or for no reason at all. Also, the evidence from Sears and Sue about their emotional distress and mental anguish was sparse.

To support a finding that Farm Bureau's investigation was not ordinarily prudent, or that a negligent investigation caused him to be fired, Sears must have produced additional evidence to meet his burden of proof. Because he did not, the jury's findings must be set aside. *Id.*

### Conclusion

The evidence does not support the jury's finding that the company's investigation fell below a level of an ordinarily prudent investigation, causing Sears to be fired. We find the evidence factually insufficient to support the jury's finding. Therefore, that finding is set aside. Consequently, the finding of gross negligence must also be set aside and the judgment reversed as to those claims.

### Damages Award for Past Mental Anguish and Past Loss of Pecuniary Income

Because we find the evidence factually insufficient to support the jury's findings

on negligence and gross negligence, the jury's awards for past mental anguish, past loss of pecuniary income, and exemplary damages also must fail.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 Farm Bureau complains that the evidence is legally insufficient ("no evidence") to support the finding that it intentionally inflicted emotional distress on Sears.[5] The tort of "intentional infliction of emotional distress" was expressly adopted in Texas in *Twyman v. Twyman*, 855 S.W.2d 619 (Tex.1993). The court adopted the tort as set out in section 46(1) of the Restatement of Torts. RESTATEMENT (SECOND) OF TORTS § 46(1) (1965). The elements are: (1) the defendant acted intentionally or recklessly, (2) the conduct was extreme and outrageous, (3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe. *Id.* The restatement requires that liability should be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* cmt. d.

 Whether the defendant's conduct is so extreme and outrageous, and whether the plaintiff suffered severe emotional distress, to permit recovery are preliminary questions of law to be decided by the court. *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993); *Qualicare of East Texas, Inc. v. Runnels*, 863 S.W.2d 220, 222 (Tex.App.—Eastland 1993, no writ); RESTATEMENT (SECOND) OF TORTS § 46 cmt. j. (1965). Otherwise, when we conduct a review of whether the evidence is legally

sufficient to support a jury's finding, we consider only that evidence and the inferences therefrom which support the finding, considered in the light most favorable to the finding, and disregarding contrary evidence and inferences. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d, 497, 499 (Tex.1995); *Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992). We will find the evidence legally insufficient if: (1) there is a complete absence of evidence for the finding, (2) there is evidence to support the finding, but rules of law or evidence bar the court from giving any weight to the evidence, (3) there is no more than a mere scintilla of evidence to support the finding, or (4) the evidence conclusively establishes the opposite of the finding. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L.REV. 361, 362–63 (1960)). "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome*, 907 S.W.2d at 499 (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994)).

### *Extreme and Outrageous Conduct*

 We recognize, however, that the Texas Supreme Court has adopted a strict approach to intentional infliction of emotion distress claims arising in the workplace. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex.1999). Thus, Texas courts hold that a claim for intentional infliction of emotional distress does not lie for ordinary employment disputes. *Id.* The employee must prove the existence of some conduct that brings the dispute outside the scope of an ordinary employment

---

5. The company does not complain about factual insufficiency here.

dispute and into the realm of extreme and outrageous conduct. *Id.*

An employee's firing, even if wrongful, *e.g.,* in retaliation, alone does not constitute legally sufficient evidence of extreme and outrageous conduct. *Southwestern Bell Mobile Sys. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998). Evidence that a firing was done in the unnecessary presence of coworkers, accompanied by instructions to remove personal belongings and by repossessing car telephones, does not constitute legally sufficient evidence of extreme and outrageous conduct. *Id.* Neither is evidence that an employer wrongfully accused an employee of thievery and then fired the employee, *Diamond Shamrock Ref. and Mktg. Co. v. Mendez,* 844 S.W.2d 198, 202 (Tex.1992), or that an employee was abruptly fired and escorted off the premises by a security guard. *Wornick Co.,* 856 S.W.2d at 733–35. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, 'Outrageous!'" *Behringer v. Behringer,* 884 S.W.2d 839, 844 (Tex.App.—Fort Worth 1994, writ denied) (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). In determining whether the specified conduct is extreme and outrageous, courts consider the context and the relationship between the parties. *GTE Southwest,* 998 S.W.2d at 612.

In *GTE Southwest,* the Supreme Court found legally sufficient evidence of extreme and outrageous conduct. *Id.* at 617. For over two years the offending actor, a supervisor, "engaged in a pattern of grossly abusive, threatening, and degrading conduct," including obscene jokes, vulgar cursing, sexual innuendo, screaming and yelling, behavior which threatened physical violence, and threats of retaliation for employees reporting his conduct. *Id.* at 613–14. The court said that while individual instances of bad conduct might not be extreme or outrageous enough to constitute the element, a cumulation of bad conduct over time could be, especially if the conduct is by someone in a position of authority. *Id.* at 615. The court held that the supervisor "greatly exceeded the necessary leeway to supervise, criticize, demote, transfer, and discipline, and created a workplace that was a den of terror for the employees." *Id.* at 617.

Conduct does not have to be as extreme or protracted as in *GTE Southwest* to be extreme and outrageous. In *American Med. Int'l, Inc. v. Giurintano,* an assistant hospital administrator spread rumors among co-workers that the plaintiff would, if promoted, be a poor administrator, would be difficult to work with, and would fire all department heads and supervisors. 821 S.W.2d 331, 341–42 (Tex.App.—Houston [14th Dist.] 1991, no writ). In addition, a group of doctors spread rumors that the plaintiff was responsible for a pharmacist quitting, and the group in an organized manner made degrading and inflammatory remarks to the plaintiff. *Id.* The court found that, "taken separately each incident, comment or confrontation would seem to belie the existence of outrageous conduct on the part of the appellants. However, when taken together and considered in context and the appropriate time frames, there is circumstantial evidence of a conspiracy on the part of the appellants to intentionally put Giurintano in confrontational situations and use his responses to these confrontations for the purpose of opposing his appointment. These actions along with the conduct of Mata, an agent of Doctors' Hospital, constitute outrageous conduct on the part of the appellants. There is more than a scintilla of evidence to support this finding." *Id.* at 342.

In *Qualicare,* the plaintiffs became dissatisfied with their jobs and quit to form their own home health care business. 863 S.W.2d at 223. Their former supervisor began a campaign of harassment in which she threatened the plaintiffs, sent a black floral arrangement to them, and made "hang-up" phone calls at all hours to their home and business numbers. The court found some evidence to support the jury's finding in plaintiff's favor. *Id.*

Here, the trial judge, by submitting the issue to the jury, made the threshold finding that Farm Bureau's conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery." *Wornick Co.,* 856 S.W.2d at 734 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). It then became the jury's duty, subject to the court's control, to determine whether, in these particular circumstances, the conduct had been sufficiently extreme and outrageous to result in liability. *GTE Southwest,* 998 S.W.2d at 616. The jury was instructed that "extreme and outrageous conduct" means "conduct [that] has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." There was evidence that Graham and the company pursued a damaging course of action against Sears even after Sears was fired,[6] by involving several federal agencies with punitive powers such as the IRS and by attempting to have Sears's insurance license revoked. Inferentially, this was solely to punish Sears. We find the apparently unnecessary and largely unexplained pursuit of punitive action against Sears after he was fired to support the trial court's determination that the conduct was "Outrageous!"

*Behringer,* 884 S.W.2d at 844. We also find more than a scintilla of evidence of extreme and outrageous conduct to support the jury's finding on this claim. Thus, the finding is supported by legally sufficient evidence.[7]

### Intentional or Reckless Conduct

 Intent in this tort is assessed by whether (1) the actor intends to cause severe emotional distress, or (2) severe emotional distress is the primary risk created by the actor's reckless conduct. *Standard Fruit & Vegetable Co., Inc. v. Johnson,* 985 S.W.2d 62, 63 (Tex.1998). The question is whether Graham, Callaway, or others intended to cause Sears severe emotional distress or engaged in conduct the primary risk of which was that Sears would suffer severe emotional distress.

The primary risk, or at least one of them, of the company's conduct toward Sears, including Graham's involvement of the local police, and especially the pursuit of Sears through federal agencies and the State Insurance Board after Sears had been fired, was that Sears would suffer severe emotional distress, at least from the threat, real or imagined, of criminal prosecution. Inferentially, this evidence is also some evidence that from the beginning Graham and others intended to inflict severe emotional distress on Sears. Therefore, we find more than a mere scintilla of evidence to support the "intent" element.

### The "Intent" of the Company

 The tort applies to the workplace, and a person may recover against an employer if the person can establish the four elements of the tort and can also establish that the employer, and not just

---

**6.** Once Farm Bureau had fired Sears, its actions were no longer in the employer-employee context.

**7.** The jury did not find that Farm Bureau inflicted severe emotional distress upon Sears's wife, Sue.

the actor directly inflicting the emotional distress, had the requisite intent, *i.e.,* "intentionally or recklessly." *GTE Southwest,* 998 S.W.2d at 611.

■ Generally, a master is vicariously liable for the torts of its servants committed in the course and scope of their employment. *Id.* at 617 (citing RESTATEMENT (SECOND) OF AGENCY § 219(1) (1958)). This is true even though the employee's tort is intentional when the act, although not specifically authorized by the employer, is closely connected with the servant's authorized duties. *See id.* If the intentional tort is "committed in the accomplishment of a duty entrusted to the employee, rather than because of personal animosity," the employer may be liable. *See id.*

Farm Bureau has cited no evidence that any of the acts we have discussed were motivated by personal animosity. The evidence shows employees, supervisors, or investigators carrying out their assigned duties. The jury concluded that the acts were committed on behalf of Farm Bureau, and there is some evidence to support this finding. Thus, Farm Bureau is liable for this conduct.

### Severe Emotional Distress

■ The jury was instructed that "severe emotional distress" must be "so severe that no reasonable person could be expected to endure it without undergoing unreasonable suffering."

In *Giurintano,* the court found more than a mere scintilla of evidence of severe emotional distress because the plaintiff "felt like everything had fallen apart," lost his job and home, felt lost, confused, and dazed, felt depressed and frustrated, looked older, grayer, and thinner, and lost his enthusiasm for life. *Giurintano,* 821 S.W.2d at 343.

Here, Sears testified that he lost his income from selling insurance and could not get a job as an insurance agent, a career he had enjoyed. As a result there was "almost a complete turn-around in [their] life-style." He and his wife went through an economic depression. They could no longer assist their children financially. Sears's retirement program was canceled. He also had to cancel his life insurance. He and his wife drove old cars. There was also evidence about how Sears was treated by Graham and the company, including the referrals made to federal agencies. Inferences that the Sears felt some severe humiliation, fear, and despair are not unreasonable from the facts in this case.

■ It is within the jury's province to judge the credibility of witnesses and the weight to be given their testimony. *Kneip v. UnitedBank Victoria,* 774 S.W.2d 757, 759 (Tex.App.—Corpus Christi 1989, no writ). This is especially true regarding claims for mental anguish, which are necessarily speculative claims and, thus, should be left to a jury for determination. *Id.* at 760. "Part of the proof in a case includes the witnesses themselves, their demeanor, their voice modulation, and the gut feeling they project to the jurors. These are aspects of a case to which an appellate judge has no access." *Herbert v. Herbert,* 754 S.W.2d 141, 147 (Tex.1988) (Mauzy, J., dissenting).

We find that, giving due deference to the credibility and demeanor findings of the jury, and the inferences that are reasonable from the evidence, there was more than a mere scintilla of evidence of severe emotional distress.

### Conclusion

The evidence was legally sufficient to support the jury's finding that Farm Bureau intentionally inflicted emotional distress on Sears.

## CONCLUSION

The trial court's judgment as to Sears's negligence and gross negligence claims is reversed, and those claims are severed and remanded to the trial court for trial. The remainder of the trial court's judgment is affirmed.

Justice GRAY dissenting.

GRAY, Justice, dissenting.

This is nothing more than yet another attack on the employment-at-will doctrine in Texas.[1] Having failed to timely pursue a slander or libel claim, Sears now attempts to reshape the facts and damages appropriate for those claims as attributable to negligence, gross negligence, and intentional infliction of emotional distress.

### AT-WILL EMPLOYMENT IS DEAD

#### (Negligence and Gross Negligence Claims)

Regardless of Farm Bureau's negligence, if any, in conducting the investigation—it is not actionable by Sears. Farm Bureau owed Sears no duty.[2] This is an area of the law in which there is a specific need to draw a bright line distinction between the duty owed in connection with an investigation related to an "at-will" employment decision and an investigation conducted for other reasons.

Farm Bureau has included in its brief a lengthy section citing courts from other states that have considered and rejected a cause of action for negligent investigation in the termination of an at-will relationship. We need not go outside the State of Texas. The Corpus Christi Court of Appeals has recently decided this issue contrary to Sears and contrary to the majority's decision to recognize a cause of action for negligent investigation before exercising the right to terminate an at-will relationship. The Corpus Christi Court decided the issue as follows:

> Lane also argues we should recognize a new cause of action against employers. He urges this Court to impose upon employers an implied duty to exercise reasonable care when conducting a sexual harassment investigation. However, we refuse to create a new common law duty which would abrogate the traditional at-will employment contract. Absent a contract, the relationship between worker and employer is "at will," except for a few very narrow exceptions, with each party being able to end it at any time without reason or justification. *See East Line & R.R.R. Co. v. Scott,* 72 Tex. 70, 10 S.W. 99, 102 (1888); *Winters v. Houston Chronicle Pub. Co.,* 795 S.W.2d 723, 726 (Tex.1990); *see also Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985) (recognizing a narrow exception for an employee discharged for the sole reason of refusing to perform an illegal act). The Texas Supreme Court has refused to impose a general duty of good faith and fair dealing upon employers under an at-will employment agreement. *City of Midland v. O'Bryant,* 18 S.W.3d 209 (Tex.2000). Likewise, we decline to recognize a duty in this situation.
>
> Under the traditional at-will employment agreement, Wal–Mart had the absolute right to fire Lane for any reason

---

1. The parties have treated this case as being controlled by the employment-at-will doctrine because there is a written contract that specified Sears's agency agreement could be terminated at-will by giving ten days notice.

2. For a discussion of the role of the court in defining the duty, see William Powers, Jr., *W. Page Keeton Symposium on Tort Law: Judge and Jury in the Texas Supreme Court,* 75 TEXAS. L.REV. 1699 (1997).

or for no reason at all. Wal–Mart had no duty to perform any investigation before discharging Lane. *Cf. Rios v. Texas Commerce Bancshares, Inc.,* 930 S.W.2d 809, 816 (Tex.App.—Corpus Christi 1996, writ denied) (finding that employment-at-will contract cannot support a negligent investigation cause of action because employer has no duty to reasonably investigate allegations against an employee). Thus, Wal–Mart owed no duty to Lane while performing the investigation. Lane has directed us to no case in which a general negligence cause of action has been used against an employer for negligent investigation, and we have not located any such case or closely analogous situations. *See also Sibley,* 998 S.W.2d at 403 (also finding no case where a general negligence theory has been used to support a cause of action against an employer for negligent investigation); *cf. City of Midland, id.* Further, no Texas Supreme Court case has held that an employee is protected from being fired as a result of a negligent employer investigation into a claim of sexual harassment. We hold that there is no evidence to support the jury's answers to questions six and seven. We sustain the second issue.

*Wal–Mart Stores, Inc. v. Lane,* 31 S.W.3d 282, 294 (Tex.App.—Corpus Christi 2000, pet. ref'd).

To hold otherwise effectively kills the employment-at-will doctrine. We should follow the decision of the Corpus Christi Court of Appeals and thus avoid a conflict between different courts of appeals on this issue. We should not create a new cause of action, especially one that has such a potential for changing the traditional employment-at-will doctrine in the State of Texas.

With the majority having imposed liability for negligent investigation in connection with the termination of an at-will relationship, the next question we will inevitably have to answer is what is an investigation? Is a single question an "investigation" that will trigger potential liability for the discharge of an at-will employee? What if a critical follow-up question was not asked? Unfortunately the only "safe" way to dismiss an "at-will" employee will be to not ask any questions and simply walk up to an employee and open the conversation with "Your services are no longer needed. You are terminated." For me, this is an intolerable consequence of the majority's holding.

It is critical to note that holding there is no duty owed to Sears in the conduct of the investigation ordinarily would still leave Sears with a remedy. If Farm Bureau libeled or slandered Sears based on the results of a shoddy investigation, the result could be entirely different, not because the investigation was negligently performed, but for the separate tort of libel or slander. Unfortunately for Sears, due to his delay in seeking relief, the statute of limitations prevented his attempt to recover under either of these theories. I would hold Farm Bureau owed Sears no duty for the way in which the investigation was conducted. This holding would require that we reverse and render rather than reverse and remand Sears's negligence and gross negligence claims. Because the majority reverses and remands these claims, I respectfully dissent.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

With regard to the intentional infliction of emotional distress, the majority does what it has done in the past. It recites the proper rules but then, in my opinion, misapplies them to the facts. *See Bluewater Constructors, Inc. v. Murphey,* No 10–98–187 CV (Tex.App.—Waco, June 21, 2000,

pet. ref'd)(not designated for publication). Based upon my review I do not find, under Sears's version of the facts, that Farm Bureau's conduct was "extreme and outrageous." Farm Bureau was doing what it had a right, and possibly a duty, to do by conducting the investigation, not just of Sears's potential participation in a scheme to defraud an insurance company, but also investigating other people involved in the scheme, terminating the at-will relationship with Sears, and ultimately reporting the findings to various entities.

To meet the second element of intentional infliction of emotional distress, that the defendant's conduct must be extreme and outrageous, the conduct of Farm Bureau must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Natividad v. Alexsis, Inc.* 875 S.W.2d 695, 699 (Tex. 1994); *Rescar Inc. v. Ward,* —— S.W.3d ——, ——, No. 01–99–00038–CV, 2001 WL 754779, 2001 Tex.App. Lexis 4565, at *21 (Houston [1st Dist .] July 5, 2001, no pet. h.)(citing *Diamond Shamrock Refining v. Mendez,* 844 S.W.2d 198, 202 (Tex.1992) *quoting* Restatement § 46, comment d).

In *Rescar,* even the threat to "blackball" the plaintiff in the industry was not enough to support a claim for intentional infliction of emotional distress. The court held that "liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* "[E]ven when the employer's conduct rises to the level of illegality, except in the most unusual cases, it is not the sort of conduct, deplorable as it may sometimes be, that constitutes extreme and outrageous conduct ." *Id* at * 20, at ——.

Accordingly, I would hold that Sears failed to establish the second element of his intentional infliction of emotional distress claim.

But the most fundamental problem with Sears's intentional infliction of emotional distress claim ·is the complete lack of evidence of the forth element of the claim, "severe" emotional distress.

> "Severe emotional distress" means distress so severe that no reasonable person could be expected to endure it. *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 618 (Tex.1999). . . . Emotional distress was held to be severe when a plaintiff feared for his life, slept with a pistol, cried in public, and lost his appetite. *Behringer v. Behringer,* 884 S.W.2d 839, 844–45 (Tex.App.—Fort Worth 1994, writ denied). Similarly, emotional distress was held to be severe when a plaintiff refused to speak or see anyone, became ill and disoriented, and experienced extreme anger. *Tidelands Auto. Club v. Walters,* 699 S.W.2d 939, 945 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). In contrast, feelings of anger, depression, and humiliation (even when embarrassed in front of one's children), are insufficient to constitute severe distress. *Regan v.. Lee,* 879 S.W.2d 133, 136–37 (Tex.App.—Houston [14th Dist.] 1994, no writ.)

*Id.* at *23–24, at —— – ——.

The evidence of the plaintiff's emotional distress in *Rescar* was that be became depressed for about a year but had recovered on his own. The experts characterized it as "a mild to medium" form of major depression. The court held that the plaintiff

> did not suffer emotional distress to the degree required to recover for intentional infliction of emotional distress. While his distress may have been "serious,"

the evidence did not support a finding that it was "severe."

*Id.* at *24, at ――.

There is no evidence that Sears suffered any damages other than economic losses that any other at-will employee would have suffered for the sudden loss of their job. Sears first was questioned about the loss of income caused by the termination. He was then asked about the other consequences of being terminated. The full extent of the evidence of the other consequences for Sears caused by the actions of Farm Bureau is as follows:

Q. Now, after you lost the income from the insurance business, were there consequences of that?

A. Yes, sir. We―

Q. What were they?

A. We had to actually make a almost complete turnaround on our life-style. I had some property that was mortgaged. I―I lost that. I couldn't―couldn't pay― make the payments on that. I had to cancel my retirement program that I had with the company. I was putting in $300 a month, and they were matching part of that, and I had to cash that in. I had to cancel my life insurance policies. I couldn't afford to pay the premium on those.

Q. What about things at home, in general, after?

A. Well, we were―we had been helping our children as much as possible, you know, throughout the time, and I could not help them anymore. We couldn't trade vehicles or anything like that. I'm―well, at the time, I'm driving a '88 model vehicle with about 220 something thousand miles on it. My wife drives an '84 model with almost that many miles. We―we can't afford any― anything. It's just―we just sitting on a―on zero, period.

This testimony is nothing more than additional economic, not emotional, consequences of having lost his job. There is no testimony regarding the emotional consequences on Sears of Farm Bureau's actions. The evidence presented is not what the Supreme Court and other courts of appeals have characterized as severe emotional distress.

Accordingly I would also reverse the trial court's judgment and render judgment that Sears take nothing from Farm Bureau on his claim of intentional infliction of emotional distress. Because the majority does not, I respectfully dissent.