**Donald CAIN, Appellant,**

v.

**Cecilia CAIN and Jennifer Cain, Appellees.**

**No. 01–93–00010–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 10, 1994.

Rehearing Overruled March 3, 1994.

---

Hirsch, Glover, Robinson & Sheiness, Jack McKinley, Houston, for appellant.

Ray Putney & Associates, Sydney Nell Floyd, Ray Putney, Houston, for appellees.

Before ANDELL, DUGGAN and HUTSON–DUNN, JJ.

## OPINION

ANDELL, Justice.

Cecilia Cain, individually and as next friend of Jennifer Cain, obtained a judgment against Donald Cain and Kimberly Hansel for damages arising out of approximately 35 sexual assaults committed against Jennifer by James Hansel while Jennifer stayed at Donald's home. Only Donald appeals the trial court's judgment. We affirm.

### The Facts

#### A. The protagonists

This case involves interactions among several people, all of whom are or were related to one another either by blood or marriage. For this reason, we first state their names and explain how they are or were related to each other.

##### 1. Jennifer Cain (Jennifer)

Jennifer is the daughter of Cecilia Cain. Her father is deceased. She is the niece of Donald Cain, the older sister of Cheryl Cain, a first cousin to Kimberly Hansel, a first cousin by marriage to James Hansel, and a second cousin to Carl Hansel.

##### 2. Cecilia Cain (Cecilia)

Cecilia is Jennifer's mother. She is the sister-in-law of Donald Cain, the mother of Cheryl Cain, and an aunt by marriage to Kimberly Hansel and James Hansel. Her husband, Jennifer's father, is deceased.

##### 3. Donald Cain (Donald)

Donald is Jennifer's uncle. He is the brother-in-law of Cecilia, the father of Kimberly Hansel, the father-in-law of James Hansel, the grandfather of Carl Hansel, an uncle to Cheryl Cain, and the ex-husband of Kay Babineaux.

##### 4. Cheryl Cain (Cheryl)

Cheryl is Jennifer's younger sister. She is a daughter of Cecilia Cain, a niece of Donald

Cain, a first cousin to Kimberly Hansel, a first cousin by marriage to James Hansel, and a second cousin to Carl Hansel.

### 5. James Hansel (James)

James is Jennifer's first cousin by marriage. He is Donald's son-in-law, Kimberly's husband, Carl's father, Cheryl's first cousin by marriage, and a nephew by marriage to Cecilia.

### 6. Kimberly Hansel (Kimberly)

Kimberly is Donald's daughter and James' wife. She is a niece by marriage to Cecilia, a first cousin to Jennifer, a first cousin to Cheryl, and Carl's mother.

### 7. Carl Hansel (Carl)

Carl is James' and Kimberly's son. He is Donald's grandson, a second cousin to Jennifer, and a second cousin to Cheryl.

### 8. Kay Babineaux (Kay)

Kay is Donald's ex-wife.

## B. The events

The jury heard evidence of the following facts.

Jennifer's father died when she was six years old. She had little contact with her father's family until she turned 13, when she called her uncle Donald in an attempt to renew relations with the family. The reception to her overture was warm, and in August, 1988, Donald hosted a family barbecue at his home in Houston, where he, James (then 40 years old), Kimberly, and Carl all lived. Jennifer was to move to Virginia with her mother, Cecilia, and her sister, Cheryl, on the day after the barbecue.

After the barbecue ended and everyone had gone home, Jennifer received a call from first cousin James, who asked her to spend her last night in Houston at Donald's house to help Kimberly care for Carl. Jennifer obtained permission to spend the night, and James picked her up and took her to Donald's house.

That night, Jennifer slept on a pallet next to James' bed. She awoke in the early morn-

ing hours to find that James was fondling her. She rejected James' advances; James tearfully asked that she forgive him for what he had been doing, and pledged not to repeat the incident. Believing James' assertion that he would never do it again, and fearful of hurting Kimberly and Cecilia, Jennifer told no one about what had happened. She left for Virginia with Cecilia and Cheryl as scheduled.

After Jennifer moved to Virginia, James called her frequently. He discussed setting her up in a modeling career and finding her employment on a cruise ship. The relationship between James and Jennifer grew, and Cecilia was pleased that her daughter had found a father figure and had opportunities for gainful employment.

Shortly after Jennifer, Cecilia, and Cheryl left for Virginia, James was arrested for and charged with sexual assault of a child. He was accused of assaulting a 17-year-old girl at his workplace.

James pled guilty and received probation. As conditions of his probation, James was forbidden to use alcohol or drugs, forbidden to supervise girls under 17 years of age, and required to attend therapy for sex offenders.

Donald, who, as an ex-sheriff, had a background in law enforcement, knew that James had been convicted of sexual assault, and discussed James' conviction with him. James told Donald that a young lady who was working for him had been giving him a lot of trouble, so he fired her. He told Donald that the lady had returned with her brother to knock the windows out of his car, and subsequently demanded $500 in return for not filing "some charges" against him. James said that she filed the charge, but he explained that he was in fact innocent, and stated that he had pled guilty because he had no confidence in his court-appointed attorneys and did not have the funds to hire counsel of his own and fight the charge. Donald found James' explanation plausible. Donald knew that James was on probation, and that as part of his probation, he was forbidden to drink alcohol.

The next year, Cecilia decided to move back to Houston. Jennifer and Cheryl want-

ed to return early, so Cecilia asked Donald and Kimberly whether the girls could stay in Donald's house until Cecilia returned. Donald and Kimberly agreed to the proposal. Kimberly was pleased because she already had Carl to care for and was then pregnant with her second child, so she looked forward to Jennifer's and Cheryl's help with the housework and with caring for Carl. Donald did not tell Cecilia about James' conviction of sexual assault of a child, or about the conditions of James' probation.

Jennifer, then 14, and Cheryl, then 12, left Virginia for Donald's home in Houston. When Jennifer and Cheryl moved in, the residents in Donald's home already included Donald, James, Kimberly, Carl, and occasionally James' children from a previous marriage. At the time of the girls' arrival, however, James was in jail for violating his probation. He had failed to pay a fine and had not consistently attended sex offender therapy. Donald was aware that James had violated his probation.

Jennifer and Kimberly visited James during his stay in jail for violating his probation. James told Jennifer that he had pled guilty to sexual harassment, but that the charges were false. Cecilia knew that James had been charged with some sort of sex offense, and Kay told Cecilia that James had been charged with sexual harassment.

On the night that James was released from jail and returned to Donald's house, James insisted that Jennifer have a drink with him before they retired for the evening. Jennifer protested, but James kept pestering her, following her throughout the house, until she finally consumed the drink. Donald witnessed this scene. After James and Jennifer had their drink, they went to their separate beds. James awakened Jennifer in the early morning hours and raped her.

Jennifer and Cheryl stayed at Donald's home for approximately two and a half weeks until Cecilia returned from Virginia. During this time, James raped Jennifer at least four times, including the initial rape described above. Each time, James would serve Jennifer a drink before bed time, and Jennifer would go to bed alone. James would then wait until the early morning hours, when everyone else in the house was asleep, and then get in bed with Jennifer and rape her. Each time, James prevented Jennifer from crying out by placing his hand over her mouth. She told no one about James' assaults.

Donald occasionally participated when James and Jennifer would have a drink. However, in addition to knowing that the conditions of James' probation forbade him from drinking, Donald also knew that Jennifer was under the legal drinking age.

Cecilia returned to Houston on July 3, 1989. After Cecilia set up house, Jennifer continued to spend weeknights at Donald's home. Jennifer testified that her desire to spend time with Kimberly's children motivated her desire to return to Donald's house.

James continued his sexual assaults on Jennifer during these overnight stays. During July, 1989, the assaults took place at least two or three times a week.

From September 1989, through March, 1990, Jennifer visited Kimberly's and James' children on the weekends. James' assaults continued until they reached approximately 35 in number. The last one occurred on April 7, 1990.

Jennifer's exposure of what James had been doing to her was prompted when she read an article in *Seventeen* magazine about the risk of AIDS. Jennifer wrote a letter to the magazine describing what James had been doing to her and seeking advice. The magazine replied to Jennifer's letter, and in May, 1990, Jennifer showed her letter and the magazine's response to Cecilia and the mother of Jennifer's best friend. Cecilia confronted Donald and Kimberly with the news of James' sexual assaults on Jennifer. This was the first Donald knew of what James had been doing to Jennifer at his home.

Cecilia contacted the police, and James was again convicted of sexual assault of a child. In the middle of 1991, upon reading some materials relating to James' first conviction which were sent to James at Donald's home, Donald discovered that James had lied to him about the specific circumstances of his previous arrest and conviction.

Cecilia, on behalf of herself and Jennifer, sued Donald and Kimberly. The jury found Donald 25 percent liable and Kimberly 75 percent liable. As noted above, only Donald appeals from the trial court's judgment.

### Point of Error One

In point of error one, Donald contends that the trial court erred in charging the jury on a general negligence standard of care rather then charging the jury on the standard of care owed to a licensee according to premises liability law. The jury was charged that "negligence" means

> failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

Donald argues that he owed no "general duty" to Jennifer, and that any duty he owed her could only have been that owed to a licensee under the circumstances.

We disagree. We acknowledge that, as Donald points out, Texas law requires the existence of a legal duty before liability in tort may be imposed on a defendant. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987). We also acknowledge, even more specifically, that "[a]s a general rule, a defendant has no duty to prevent the criminal acts of a third party who does not act under the defendant's supervision or control." *Haight v. Savoy Apartments*, 814 S.W.2d 849, 853 (Tex.App.—Houston [1st Dist.] 1991, writ denied). However,

> [a]n exception to this rule exists when criminal conduct is the foreseeable result of a defendant's negligence. In such a case, the defendant has a duty to prevent injuries to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured. It is not required that the particular accident complained of should have been foreseen. All that is required is that the injury be of such a general character as might reasonably have been anticipated,

and the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.

*Id.*

Applying those principles here, Donald, under the rule, had no duty to prevent the criminal acts perpetrated on Jennifer by James, a third party who did not act under Donald's supervision or control. Our inquiry, therefore, is whether the *exception* applies, i.e., whether the criminal conduct was the foreseeable result of Donald's negligence.

The evidence indicates that when Donald allowed Jennifer into his home, he knew that it was already inhabited by an adult male who had pled guilty to and been convicted of sexual assault of a child. He knew that James was on probation for that offense, and that he had violated that probation. Despite having the opportunity, Donald did not inform Jennifer's mother, Cecilia, of these facts. Further, despite the fact that Donald knew both that the conditions of James' probation forbade him from drinking *and* that Jennifer was too young to legally drink, he observed, participated in, and did not object to James drinking and serving alcohol to Jennifer, even when she did not want it.

Under these facts, we hold that a jury could reasonably conclude that James' criminal conduct toward Jennifer was the foreseeable result of Donald's negligence, manifested in the acts and omissions described above. Thus, the exception, not the rule, applies, and Donald therefore had a duty to prevent the harm to Jennifer, because it reasonably should have appeared to him that Jennifer might be victimized by James. *See Haight*, 814 S.W.2d at 853. There was sufficient evidence indicating that Donald knew or should have known that James would harm Jennifer as a result of Donald's acts and omissions, including the act of allowing Jennifer into his house—a home in which James already resided. Because James' criminal conduct was the foreseeable result in the volatile and dangerous situation that Donald helped create, Donald had a duty to prevent the injury to Jennifer—a duty arising independently of Jennifer's legal relationship to

him under premises liability law. *See id.* (duty arises "if it reasonably appears or should appear to [the defendant] that others in the exercise of their lawful rights may be injured"). Clearly, Jennifer's injury was of a character that "might reasonably have been anticipated"; herself a child, she was sexually assaulted by a man who had pled guilty to and been convicted of sexual assault of a child.

We hold that the trial court did not err in charging the jury on a general negligence standard of care.[1]

We overrule point of error one.[2]

**Point of Error Two**

In point of error two, Donald argues that the trial court erred in admitting irrelevant and inflammatory evidence that he struck Kay and waved a pistol at her. Kay testified that Donald "has a temper sometimes, and he would slap me," and that he had "brandished a gun" at her.

■ When an appellant complains of the allegedly improper admission of testimony, but cannot meet its appellate burden to show how the testimony, even if improperly admitted, was calculated to cause and probably did cause the rendition of an improper judgment, the appellate court need not reach the merits of the appellant's complaint. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex.1990). Here, Donald has failed to show how Kay's testimony, even if improperly admitted, was calculated to cause and probably did ·cause the rendition of an improper judgment.

"When erroneously admitted evidence ... does not concern a material issue *dispositive of the case*, the error is harmless." *Mancorp*, 802 S.W.2d at 230 (emphasis added). "Harmfulness is determined by looking at the entire record to see whether the judgment was controlled by the testimony that should have been excluded." *Id.*

■ The evidence of which Donald complains spoke to his character and his credibility. However, neither his character nor his credibility was a material issue "dispositive of the case." The dispositive issue was whether Donald was negligent in, among other things, allowing Jennifer into his home under the circumstances. The facts supporting the jury's finding on this issue have nothing to do with Donald's character and credibility, because these facts were *undisputed.* It was undisputed that: (1) when Donald allowed Jennifer into his home, he knew that he was allowing her to live in the same house as an adult male who had recently pled guilty to and been convicted of sexual assault of a child; (2) Donald knew at the time that James was on probation for that offense, and that he had violated his probation; (3) Donald did not inform Jennifer's mother, Cecilia, of James' sex-related legal woes; and (4) Donald observed, participated in, and did not object to James drinking and serving alcohol to Jennifer, even when she asserted that she did not want it.

After reviewing the entire record, we hold that the judgment was not "controlled by"

---

1. We note that Jennifer was not required to introduce evidence of the relevant standard of care in this case. "[I]f the circumstances surrounding the occurrence would indicate the potential risk of harm to a reasonably prudent person, the duty to use ordinary care arises, and the plaintiff need not introduce evidence of the pertinent standard of care." *Figure World, Inc. v. Farley*, 680 S.W.2d 33, 36 (Tex.App.—Austin 1984, writ ref'd n.r.e.).

2. This result should not be construed as a holding that a general negligence charge, and not a premises liability charge, may be given in *every* case where the harm occurs on the defendant's premises. Although we recognize that premises liability cases are tried on negligence principles, *see University of Texas at Austin v. Hinton*, 822 S.W.2d 197, 204 (Tex.App.—Austin 1991, no

writ), there are doubtlessly cases involving harm on the premises that should *not* go to the jury as general negligence cases. *See, e.g., Physicians & Surgeons General Hosp. v. Koblizek*, 752 S.W.2d 657 (Tex.App.—Corpus Christi 1988, writ denied) (plaintiff slipped and fell because of allegedly dangerous floor condition; court held pleadings and evidence called for premises liability charge, not general negligence charge). We recognize the distinction set out in *Koblizek*: cases involving potential liability for an on-premises *activity* "are properly charged as typical negligence cases," while cases involving potential liability for an on-premises *defect* are properly charged as premises liability cases. 752 S.W.2d at 659, 660; *see Skaggs Alpha Beta, Inc. v. Nabhan*, 808 S.W.2d 198, 201 (Tex.App.—El Paso 1991, no writ).

Kay's testimony that Donald had struck her and waved a pistol at her. We overrule point of error two.

## Conclusion

Finding no merit in Donald's complaints, we affirm the judgment of the trial court.