**TEXAS FARM BUREAU MUTUAL INSURANCE COMPANIES, Petitioners,**

v.

**James SEARS, et ux., Respondents.**

No. 01–0851.

Supreme Court of Texas.

Argued April 16, 2002.

Decided Aug. 30, 2002.

Rehearing Denied Oct. 10, 2002.

David J. Beck, Linda K. McCloud, Beck Redden & Secrest, Houston, Brent C. Howard, Howard & Davis, Tyler, Sherwin A. Winniford, Fulbright Winniford Bice & Marable, Waco, Anne Pike, Beck Redden & Secrest, Houston, for Petitioners.

Ron Adkison, Wellborn Houston Adkison Mann Sadler & Hill, Henderson, for Respondents.

Justice O'NEILL delivered the opinion of the Court.

In this case, we must decide whether an insurance company owes its at-will independent agent a common-law duty of ordinary care in investigating the agent's alleged misconduct. We must also determine whether the company's alleged conduct will support the agent's claim for intentional infliction of emotional distress. A divided court of appeals held that the company did owe its agent such a duty,

and that the evidence was legally sufficient to support the agent's recovery for intentional infliction of emotional distress. 54 S.W.3d 361. We decline to recognize a negligent-investigation cause of action in this circumstance, because to do so would substantially alter the parties' at-will relationship. Additionally, we hold that the company's alleged actions do not rise to the level of extreme and outrageous conduct necessary to maintain a claim for intentional infliction of emotional distress. Accordingly, we reverse the court of appeals' judgment and render judgment that the agent take nothing.

## I

### Background

James Sears worked as an independent insurance agent for Texas Farm Bureau Insurance Companies. According to their agreement, either party could terminate the contract with ten days notice "and no cause shall be required." Thus, Sears was an at-will agent and, as the parties acknowledge, his relationship with Texas Farm Bureau has all the characteristics of at-will employment.

In 1983, Sears reported to the office manager, Joe Sweat, that a Farm Bureau adjuster, a local contractor, and possibly some agents were involved in a kickback scheme. Both Sears and Sweat reported these allegations to Farm Bureau's main office. Over the next few years, Sears made similar reports to his superiors, including a district manager, but Farm Bureau did not act on any of these allegations. In 1990, a policyholder, who later was identified as Sears's client, sent an anonymous letter to Farm Bureau and the Texas Department of Insurance alleging that Mickey Walker, a local contractor, Don Lackey, a Farm Bureau adjuster, and Sears were all involved in a kickback scheme. According to the letter, Sears referred insureds to Walker, who made inflated bids that Lackey then approved. The letter also alleged that Sears was aware that insurance claims were being inflated.

Because of these allegations, Farm Bureau's internal auditor, Darren Callaway, reviewed Sears's files and determined that a few claims were suspicious. Farm Bureau decided to investigate the alleged kickback scheme and hired a private investigator, Bill Graham, to conduct the investigation. According to Sears, Farm Bureau established no guidelines for Graham's investigation. Sears claims that Graham unfairly targeted him and used unethical investigation methods, such as falsely implying that the police believed Sears was involved in criminal activity, and contacting other insurance agencies in the local market. Although Graham's investigation uncovered no direct evidence that Sears was involved in a kickback scheme, Graham alerted Farm Bureau that, because Sears had suspicious dealings on two claims, Sears should be considered a suspect. After reviewing and assessing Graham's findings, Farm Bureau terminated Sears on October 1, 1990. Sears alleges that the investigation tainted him in the local insurance market and prevented him from finding a job.

After Farm Bureau terminated Sears, it turned the investigation's results over to the Texas Board of Insurance, the United States Postal Service, the United States Attorney's Office, the Internal Revenue Service, and various other federal agencies. There was evidence that Graham or Callaway had Walker, the contractor involved in the kickback scheme, prepare an IRS Form 1099 listing the amount Sears allegedly received in kickbacks, implying that Sears had evaded taxes by failing to report this income. In addition, Farm Bureau unsuccessfully attempted to persuade

the Insurance Board to revoke Sears's license to sell insurance. Although Lackey and Walker were indicted, and Walker was convicted, the criminal authorities never took action against Sears.

In 1993, Sears and his wife sued Farm Bureau, Sweat, and Lewis Rix, the district manager, alleging defamation, negligent and grossly negligent investigation, negligent and intentional infliction of emotional distress, and wrongful discharge. The trial court granted summary judgment for Rix and Sweat on all claims, and for Farm Bureau on all claims except negligence and intentional infliction of emotional distress. The jury found Farm Bureau liable for negligent and grossly negligent investigation and for intentional infliction of emotional distress, and awarded compensatory and punitive damages. The trial court rendered judgment on the verdict for Sears. The court of appeals affirmed the judgment on the intentional infliction of emotional distress claim. The court also held that Farm Bureau owed Sears a duty to use ordinary care in its investigation, but concluded that the evidence was factually insufficient to support the jury's verdict on this claim. Accordingly, the court severed the negligent-investigation claim, and remanded for a new trial. *Id.* at 367. We granted review to decide whether, in conducting its investigation, Farm Bureau owed a duty of ordinary care to Sears, its at-will agent, and to determine whether Farm Bureau's alleged conduct will support a claim for intentional infliction of emotional distress.[1]

## II

### Negligence

■ We have never decided whether an employer owes its at-will employee a duty of ordinary care in investigating alleged misconduct. Of course, an employer has no duty to investigate at all before terminating an at-will employee, because either party may end the relationship at any time without reason or justification. *See Garcia v. Allen,* 28 S.W.3d 587, 591 (Tex.App.-Corpus Christi 2000, pet. denied); *Rios v. Texas Commerce Bancshares, Inc.,* 930 S.W.2d 809, 816 (Tex.App.-Corpus Christi 1996, writ denied). But there is a conflict among our courts of appeals on whether an employer owes its at-will employee a duty of ordinary care once it has decided to investigate the employee's alleged misconduct. *Compare Texas Farm Bureau Ins. Cos. v. Sears,* 54 S.W.3d at 369, *with Wal-Mart Stores, Inc. v. Lane,* 31 S.W.3d 282, 294 (Tex. App.-Corpus Christi 2000, pet. denied) (holding employer has no implied duty to exercise reasonable care when conducting sexual harassment investigation).

The court of appeals in this case premised its duty holding on the risk/utility formulation we articulated in *Bird v. W.C.W.:*

> In determining whether to impose a duty, this Court must consider the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden· of guarding against the injury and the consequences of placing that burden on the actor.

---

1. In the court of appeals, Sears did not pursue the claims on which the trial court granted summary judgment, and we do not consider the viability of such claims in this context. Sears did rely on a negligent-undertaking theory in the court of appeals, arguing that by initiating the investigation Farm Bureau assumed a duty of ordinary care. The court of appeals rejected this argument, and Sears does not pursue it here. *See* 54 S.W.3d at 368; RESTATEMENT (SECOND) OF TORTS § 323 (1965). Instead, Sears seeks only to impose an ordinary common-law negligence duty, and we will similarly confine our analysis.

868 S.W.2d 767, 769 (Tex.1994), cited in *Texas Farm Bureau Ins. Cos. v. Sears,* 54 S.W.3d at 368. The court of appeals considered factors favoring imposing a duty to be the foreseeability and likelihood that "if the investigation unjustly implicated Sears in the 'kickback' scheme, he would be fired, his reputation would be damaged so that he could not gain other employment in the insurance field, and he would suffer financial ruin, to name a few." 54 S.W.3d at 369. The court considered "foreseeability" of the risk to be the " 'foremost and dominant consideration' " in applying the test. 54 S.W.3d at 368 (quoting *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1994)). Although acknowledging that "social utility" weighed against imposing such a duty because insurance companies should be encouraged to "guard against fraud and wrongdoing," the court determined that the burden accompanying this duty is slight because employers have control over their investigations. *Id.* at 369. Weighing these factors, the court concluded that Farm Bureau owed Sears a duty to use reasonable care in conducting the investigation. *Id.*

█ We conclude that the court of appeals erred in conducting its risk/utility analysis because it wholly failed to consider the impact imposing such a duty would have on the at-will employment doctrine. *See Bird,* 868 S.W.2d at 769 (considering, among other factors, the consequences of imposing a duty on a party). Under that doctrine, absent a contract, the relationship between an employer and an employee is "at will," meaning that, except for very limited circumstances not relevant in this case, either party may terminate the employment relationship for any reason or no reason at all. *See City of Midland v. O'Bryant,* 18 S.W.3d 209, 216 (Tex.2000); *Sabine Pilot Serv., Inc. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985) (recognizing a narrow exception to at-will employment for employees discharged solely because they refused to act illegally). At-will employment is an important and long-standing doctrine in Texas, *see Fed. Express Corp. v. Dutschmann,* 846 S.W.2d 282, 283 (Tex. 1993) (per curiam) (citing *East Line & R.R.R. v. Scott,* 72 Tex. 70, 10 S.W. 99, 102 (1888)), and we have been reluctant to impose new common-law duties that would alter or conflict with the at-will relationship. *See City of Midland,* 18 S.W.3d at 216 (declining to recognize a duty of good faith and fair dealing in the employer-employee relationship, in part, because this duty "would completely alter the nature of the at-will employment relationship"); *cf. Austin v. Healthtrust, Inc.,* 967 S.W.2d 400, 403 (Tex.1998) (holding that there is no common-law whistleblower exception to at-will employment because such an exception would "eviscerate the specific measures the Legislature has already adopted").

The vast majority of other states' courts that have considered the issue have declined to recognize a duty to investigate before terminating an at-will employee, or a duty to investigate an at-will employee's alleged misconduct with ordinary care. *See Walt v. State,* 751 P.2d 1345, 1351 n. 9 (Alaska 1988) (holding that there is no negligent-investigation claim "in a public employer-employee context"); *Chellsen v. Pena,* 857 P.2d 472, 476–77 (Colo.Ct.App. 1992) (refusing to recognize a claim for negligent breach of a contractual duty to examine an employee's record); *Morris v. Hartford Courant Co.,* 200 Conn. 676, 513 A.2d 66, 68 (1986) (declining to recognize a negligent-investigation claim); *Theisen v. Covenant Med. Ctr., Inc.,* 636 N.W.2d 74, 82 (Iowa 2001) (rejecting a negligent-investigation claim because it "goes to the heart of the employer's decision-making process" and would "create an exception swallowing the rule of at-will employment"); *Bagwell*

*v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 665 A.2d 297, 320–21 (1995) (holding that an employee does not have a negligent-investigation claim, in part, because of the at-will employment relationship); *Ferrett v. General Motors Corp.*, 438 Mich. 235, 475 N.W.2d 243, 246 (1991) (concluding there is no duty to evaluate or correctly evaluate an employee before termination); *Lambert v. Morehouse*, 68 Wash. App. 500, 843 P.2d 1116, 1118–19 (1993) ("[W]e conclude that Washington courts have not and should not recognize a cause of action for negligent investigation."); *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 222 (Wyo.1994) (holding that there is no claim for negligent investigation); *see also Vice v. Conoco, Inc.*, 150 F.3d 1286, 1292 (10th Cir.1998) (declining, under Oklahoma law, to recognize the negligent-investigation tort when the plaintiff alleges that the employer did not investigate harassment claims); *Johnson v. Delchamps, Inc.*, 897 F.2d 808, 811 (5th Cir.1990) (holding that, under Louisiana law, an employer may terminate an at-will employee even if the reason for termination was based on incorrect or carelessly gathered information); *Rice v. Comtek Mfg. of Oregon, Inc.*, 766 F.Supp. 1544, 1549 (D.Or.1990) (stating that, under Oregon law, there is no duty to investigate an employee's conduct before termination); *Gossage v. Little Caesar Enters., Inc.*, 698 F.Supp. 160, 161, 163 (S.D.Ind.1988) (concluding that, under Indiana law, there is no negligence claim for the employer's conduct of a polygraph and voice-stress test that led to termination); *Butler v. Westinghouse Elec. Corp.*, 690 F.Supp. 424, 430 (D.Md.1987) (holding that, under Maryland law, an employer has no duty to investigate the employee's alleged violation of company policy); *but see Chamberlain v. Bissell Inc.*, 547 F.Supp. 1067, 1080–81 (W.D.Mich.1982) (recognizing a duty of ordinary care in performing contractual obligations, including conducting an annual performance review); *Kizer v. Semitool, Inc.*, 251 Mont. 199, 824 P.2d 229, 235–36 (1991) (explaining that although Montana does not generally recognize a claim for negligent termination, negligently failing to investigate an employee before discharge states a "separate and distinct" claim).

■ These courts have reasoned that a negligent-investigation claim would be inconsistent with, and would significantly alter, the at-will employment relationship. We, too, believe that recognizing such a duty in this context would significantly damage the at-will employment relationship that Texas has so carefully guarded. *See City of Midland*, 18 S.W.3d at 216.

■ By definition, the employment-at-will doctrine does not require an employer to be reasonable, or even careful, in making its termination decisions. If the at-will doctrine allows an employer to discharge an employee for bad reasons without liability, surely an employer should not incur liability when its reasons for discharge are carelessly formed. Engrafting a negligence exception on our at-will employment jurisprudence would inevitably swallow the rule. *See Figueroa v. West*, 902 S.W.2d 701, 706 (Tex.App.-El Paso 1995, no writ) (holding that an at-will employee has no negligent-termination claim); *Shell Oil Co. v. Humphrey*, 880 S.W.2d 170, 175–76 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (observing that there is no negligence exception to the at-will employment doctrine); *see also Theisen*, 636 N.W.2d at 82 (explaining that allowing a negligent-investigation claim would not only contradict the court's refusal to recognize a negligent-discharge claim but would also "swallow[ ]" the at-will-employment rule).

Moreover, a proper consideration of "the social utility of the actor's conduct, the

magnitude of the burden of guarding against the injury and the consequences of placing that burden on the actor" weighs against imposing a duty on an employer in this context. *Bird,* 868 S.W.2d at 769. Nearly every investigation that an employer conducts requires it to resolve factual disputes and make reasonable credibility determinations. Certainly it is hoped that employers will exercise due care in making the potentially devastating decision to terminate an employee for misconduct. But second-guessing an employer's judgment in such a situation provides a strong disincentive for companies to investigate allegations of employee misconduct in the first instance. It is simply not in the public's interest to dissuade employers from conducting internal investigations when employee-wrongdoing is suspected. Nor is it in employees' best interest to recognize a duty that would encourage employers to discharge employees suspected of wrongdoing without first attempting to discover the truth.

Sears argues that recognizing a negligent-investigation claim under the facts presented will not significantly alter the at-will employment doctrine, because Farm Bureau controlled the investigation and could have simply opted to terminate Sears without investigation. But again, imposing liability on Farm Bureau for taking steps to determine the validity of allegations lodged at its at-will agents creates a disincentive for insurance companies to vigorously police insurance fraud and other wrongdoing. And creating an incentive for insurance companies to summarily dismiss their agents when misconduct is merely rumored is certainly not in the best interest of agents in Sears's position. In sum, we decline to recognize a cause of action against employers for negligent investigation of their at-will employees' alleged misconduct. Accordingly, the court

of appeals erred in remanding Sears's negligent-investigation claim for a new trial.

# III

## Intentional Infliction of Emotional Distress

■■■■ To prevail on his claim for intentional infliction of emotional distress, Sears had to prove that: (1) Farm Bureau acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused Sears emotional distress; and (4) Sears's emotional distress was severe. *See GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 611 (Tex.1999). To be extreme and outrageous, a defendant's conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). Conduct that is merely insensitive or rude is not extreme and outrageous. *GTE Southwest,* 998 S.W.2d at 612. Likewise, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct." *Id.* Initially, the court must decide "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993) (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (1965)). Only when reasonable minds may differ is it for the jury, "subject to the court's control, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *GTE Southwest,* 998 S.W.2d at 616 (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (1965)).

In deciding whether particular conduct rises to an extreme and outrageous level,

we have directed that courts should consider both the conduct's context and the parties' relationship. *GTE Southwest,* 998 S.W.2d at 612. In the workplace, while an employer's conduct might in some instances be unpleasant, the employer must have some discretion to "supervise, review, criticize, demote, transfer, and discipline" its workers. *Id.* Accordingly, we have declined to recognize intentional infliction of emotional distress claims for "ordinary employment disputes," emphasizing that extreme conduct in this context "exists only in the most unusual of circumstances." *Id.* at 612–13; *see, e.g., City of Midland,* 18 S.W.3d at 217 (concluding that employer's decision to revise job descriptions or change compensation for certain positions is not evidence of extreme and outrageous conduct); *Brewerton v. Dalrymple,* 997 S.W.2d 212, 216 (Tex.1999) (finding no evidence of extreme and outrageous conduct when university administrators and employees made negative comments in professor's tenure file, denied the professor tenure, restricted his speech about his tenure file, and assigned him an allegedly excessive course load); *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998) (holding that even wrongful termination is not extreme and outrageous conduct); *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995) (determining that investigation of employee's alleged theft was not extreme and outrageous even though employer questioned employee in a severe tone, did not explain the facts, and asked employee how she could have neglected to pay for the alleged stolen item when she paid for other groceries); *Wornick,* 856 S.W.2d at 735 (holding that ordering employee to immediately leave the premises and having security guard escort employee out did not rise to the level of extreme and outrageous conduct); *Diamond Shamrock Ref. & Mktg. Co. v. Mendez,* 844 S.W.2d

198, 202 (Tex.1992) (stating "there would be little left of the employment-at-will doctrine if an employer's public statement of the reason for termination was, so long as the employee disputed that reason, in and of itself some evidence that a tort of intentional infliction of emotional distress had been committed"); *cf. GTE Southwest,* 998 S.W.2d at 617 (holding that supervisor's conduct could be considered extreme and outrageous when he regularly assaulted, intimidated, and threatened employees, creating a "den of terror" through a pattern of ongoing harassment and abuse).

■ Here, Sears contends that Farm Bureau's investigation and its post-termination conduct were extreme and outrageous. Sears points to alleged inconsistencies and deficiencies in the way Graham conducted the investigation, claiming that Graham targeted Sears while ignoring his attempts to report kickback schemes as early as 1983, and misrepresented to Sears that the police believed he was involved in criminal activity. But Farm Bureau's conduct in investigating the alleged insurance fraud, though understandably unpleasant for Sears, was in the nature of an "ordinary employment dispute" and did not rise to the level of extreme and outrageous conduct sufficient to sustain a claim for intentional infliction of emotional distress. *See GTE Southwest,* 998 S.W.2d at 612–13; *cf. Randall's Food Markets,* 891 S.W.2d at 644 (holding that an employer's investigation of an employee's alleged merchandise theft was not extreme and outrageous conduct). Farm Bureau's conduct was within the bounds of its discretion to supervise, review, discipline, and ultimately terminate, its independent agents in light of allegations regarding an ongoing kickback scheme. *See also City of Midland,* 18 S.W.3d at 217 (holding that a city's reclassification of positions formerly held by police officers as civilian positions does not rise to the level of extreme and outra-

geous conduct). Although such conduct may at times be insensitive, stressful, or even unnecessary, an insurance company must be afforded some latitude to discover and eliminate alleged insurance fraud and employee misconduct. *See also GTE Southwest*, 998 S.W.2d at 612 (noting that an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees). Assuming that Sears's complaints about Farm Bureau's investigation techniques are true, they are no evidence of extreme and outrageous conduct.

██ Sears also relies upon actions that Farm Bureau took after he was terminated to support his claim for intentional infliction of emotional distress. In particular, Sears claims that Farm Bureau acted extremely and outrageously by reporting the results of its investigation to various federal and state enforcement agencies after he was terminated, and by attempting to have his insurance license revoked. In doing so, Sears claims, Farm Bureau was carrying out a personal vendetta designed to punish Sears for making earlier reports of an alleged kickback scheme. The court of appeals specifically relied upon Farm Bureau's alleged post-termination conduct in upholding Sears's intentional infliction of emotional distress claim, stating that "the apparently unnecessary and largely unexplained pursuit of punitive action against Sears after he was fired [supported] the trial court's determination that the conduct was '[o]utrageous!'" 54 S.W.3d at 375 (quoting *Behringer v. Behringer*, 884 S.W.2d 839, 844 (Tex.App.-Fort Worth 1994, writ denied)).

██ We note that, although a defendant's motive or intent is relevant to an intentional infliction of emotional distress claim, it is not enough to support liability. *GTE Southwest*, 998 S.W.2d at 616. Rather, "the conduct itself must be extreme and outrageous." *Id.* Accordingly, any punitive intent or personal vendetta underlying Farm Bureau's post-termination acts will not, standing alone, support an extreme and outrageous finding. Instead, we must examine Farm Bureau's conduct.

The only evidence about Farm Bureau's interpretation of the investigation's findings is that it had a reasonable belief that Sears was involved in some suspicious dealings and that he had referred some clients to a contractor who was suspected of inflating bids and who was later convicted. While there was no direct evidence that Sears violated any laws, there is certainly no evidence that Farm Bureau knew the reports to be false or manipulated the findings so that Sears would be subject to criminal or other liability. Sears's complaint is that Graham's investigation should not have been turned over to the authorities because it was conducted in a negligent and offensive manner and should have been more thorough. However, that Farm Bureau made the authorities aware of its allegedly negligent investigation ′or attempted to insure that any illegal payments it suspected had occurred were reported to the Internal Revenue Service is not extreme and outrageous conduct; to hold that it is would be tantamount to imposing liability for negligent infliction of emotional distress, a cause of action that Texas does not recognize. *See Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex.1993).

We conclude that there is no evidence that Farm Bureau's conduct was extreme and outrageous, and the court of appeals erred in affirming the trial court's judgment on this basis.

**IV**

For the foregoing reasons, we reverse the court of appeals' judgment and render judgment that Sears take nothing.