**Carl Doug DYESS a/n/f A.V., Minor, Appellant,**

v.

**Leon HARRIS, Donna L. Harris, and Spaulding for Children, Appellees.**

**No. 01–08–00673–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 16, 2009.

Corrected Dissenting Opinion Oct. 26, 2009.

---

Jeffrey H. Marsh, The Marsh Law Marsh, Houston, TX, for Appellant.

Greg K. Winslett, Richard Lee Smith Jr., Dallas, TX, Zandra E. Foley, Thompson, Coe, Cousins & Irons, Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices SHARP and TAFT.*

## OPINION

SHERRY RADACK, Chief Justice.

Appellant, Carl Doug Dyess, as next friend and guardian ad litem for A.V., a minor child,[1] appeals from a traditional summary judgment rendered in favor of A.V.'s foster parents, appellees, Donna L. and Leon Harris, and appellee, Spaulding for Children, a non-profit agency that assisted in placing A.V. with the Harrises. The Harrises were also foster parents of U.N., who sexually assaulted A.V. in the Harrises' home. Dyess's single issue challenges the trial court's ruling that the Harrises and Spaulding did not owe a duty to A.V. because the assault was not foreseeable. We affirm.

---

* Justice Tim Taft, who retired from the First Court of Appeals effective June 1, 2009, continues to sit by assignment for the disposition of this case, which was submitted on May 19, 2009.

1. In 2002, the 313th District Family Juvenile Court of Harris County, Texas, appointed

## UNDERLYING FACTS AND PROCEDURAL HISTORY

### A. Background

When they became foster parents in 2002, the Harrises were approved to care for from one to five children in foster care. After moving to a much larger home, they obtained approval as a "group home" to care for a maximum of nine children. U.N. was ten years old in 2002, when the Harrises became foster parents of him and his younger brother. One of their first undertakings with U.N. was to care for him through surgery to remove a tumor on his face. Over the four years in which U.N. lived with the Harrises, they came to trust him and were planning to adopt him, having already adopted another foster child.

U.N. did well at school, generally got along well with the Harrises and the other foster children, and rarely got into trouble. Spaulding regularly monitored the care of U.N. and his brother by the Harrises and on February 17, 2006 reported positively on U.N.'s social, physical, and emotional needs while in their care. U.N. continued to miss his birth family, with whom he had some contact, but his therapist reported that U.N. was generally happy and continuing to remain positive in all areas. A Spaulding representative who visited the Harrises' home on April 6, 2006 reported that U.N. and his brother "appeared to be doing great."

The Harrises became foster parents of A.V. and her brothers in January 2006. In April 2006, A.V. was six years old, and

---

Dyess guardian ad litem for A.V. in proceedings brought by the Texas Department of Family and Protective Services in which Harris County Child Protective Services obtained custody of A.V.

U.N. was 14 years old. On the evening of April 8, 2008, Donna Harris was out of town to attend a funeral, and her husband was in charge. When A.V. misbehaved in some respect, Leon Harris placed her in a six-minute "time out" upstairs in the group home. Before the six minutes had elapsed, Leon heard a commotion and went upstairs to investigate. He saw U.N. running to the door and saw A.V. in the corner of the room with her panties down. U.N. claimed that he had found A.V. "like that" and was coming to summon Leon. U.N. denied any contact with A.V., but she stated that he had attempted to have sexual contact with her and had threatened to harm her if she told anyone. On the same evening, a ten-year-old girl in foster care with the Harrises revealed for the first time that U.N. had sexually assaulted her once before as well. It is undisputed that U.N. is in the custody of the Texas Youth Commission as a result of the incident with A.V.

**B. This Lawsuit**

Dyess sued the Harrises and Spaulding in September 2006, claiming that their negligent breach of duties owed to A.V. proximately caused the assault by U.N. and resulted in damages that Dyess claimed on A.V.'s behalf. Dyess's live pleadings against the Harrises included numerous instances of failure properly to care for, to observe, to monitor, to supervise, and to ensure the safety of the children. His live pleadings against Spaulding alleged numerous instances of failures to warn the Harrises of U.N.'s prior history and his "true state," to investigate his background, to implement measures that would have prevented the attack, and to properly and safely place foster children. Dyess also claimed that Spaulding was vicariously liable for the Harrises' negligence under agency and respondeat superior principles.

The Harrises and Spaulding answered by general denials and affirmative defenses, including contentions that the criminal conduct of a third party (U.N.) had proximately or solely and proximately caused A.V.'s injuries or, alternatively, that any injuries had resulted from an intervening, superseding, or new and independent cause that was not reasonably foreseeable.

**C. Motions for Summary Judgment and Dyess's Response**

The Harrises and Spaulding filed traditional and no-evidence motions for summary judgment, in which they argued that the assault on A.V. was not foreseeable as a matter of law, even if Texas law were to recognize a special relationship between foster parents and a foster child, which neither the Legislature nor Texas case law has yet recognized.

In response to the motions for summary judgment, Dyess claimed that U.N.'s sexual assault on A.V. was foreseeable and, therefore, that the Harrises and Spaulding had a duty to prevent it. Dyess also claimed that the foster-parent relationship between U.N. and the Harrises constituted a "special relationship" that gave rise to a duty to protect and to warn A.V. Dyess relied on deposition testimony and discovery responses to support his contentions that the Harrises and Spaulding either knew or should have known about U.N.'s tendencies and that the Harrises' primary focus was not the foster children in their care, but the income they generated that enabled the Harrises to pay for their new home. Dyess provided extensive documentation regarding the Harrises' monthly financial obligations and the tax-free income that they received as foster parents.

Dyess cited a number of factors to support his claims, including the number of children in the home, whose ages varied

from infants to 19, and the varying ethnicities and behaviors of the children. Dyess also emphasized that the Harrises conceded their lack of knowledge about the history of the children in their care, though both denied that "their job" included inquiries into potential behavior problems. Dyess further emphasized that the Harrises had recently permitted 14–year–old U.N. to stay upstairs in the group home, while other children generally remained downstairs, and that the Harrises conceded that this decision was unwise in retrospect.

### D. The Trial Court's Ruling

In rendering summary judgment for the Harrises and Spaulding, the trial court ruled that the summary judgment evidence on which Dyess relied, including U.N.'s "personal and family history, and the foster family's living arrangements[,] where children of mixed age, gender, and race living in the same home," did not establish that the incident between U.N and A.V. was foreseeable. Indeed, the court stated that the evidence fell "short of the facts of other cases" in which courts had rejected foreseeability of an injury. Concluding that those cases constituted binding precedent, the trial court granted the Harrises' and Spaulding's motions for traditional summary judgment on "no duty" grounds.

### STANDARD OF REVIEW

We review summary judgments de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). Like the trial court, we must indulge every reasonable inference in favor of the nonmovant, here Dyess, take all evidence favorable to him as true, and resolve any doubts in his favor. *See id.* We review the evidence presented by the summary judgment record in the light most favorable to Dyess, as the party against whom the summary

judgment was rendered, and we credit evidence that favors him if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

As the parties moving for traditional summary judgment based on Rule of Civil Procedure 166a(c), the Harrises and Spaulding had to establish that no genuine issue of material fact existed and that they were entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). As defendants, they were entitled to prevail either by conclusively negating at least one element of each of Dyess's causes of action as a matter of law or by conclusively establishing all elements of an affirmative defense as a matter of law. *See Sanders v. Herold*, 217 S.W.3d 11, 14 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (citing *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995)).

### NEGLIGENCE

#### A. Elements

To prevail on his claims that the negligence of the Harrises and Spaulding caused U.N.'s sexual contact with A.V., Dyess had to establish all elements of a negligence claim, specifically, that they owed a duty to A.V. to protect her from U.N. and breached that duty, which proximately caused damages to her. *See Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex.2006); *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994); *Madison v. Williamson*, 241 S.W.3d 145, 152 (Tex.App.-Houston [1st Dist.] 2007, pet. denied).

#### B. Dispositive Principles of Duty Analysis

As in any negligence case, the trial court's threshold inquiry was to determine

whether the Harrises or Spaulding owed A.V. a duty under the facts and circumstances of the occurrence that gave rise to Dyess's claims on her behalf. *See Kroger Co.,* 197 S.W.3d at 794; *Bird,* 868 S.W.2d at 769; *Madison,* 241 S.W.3d at 152. When the facts are undisputed, the court determines duty as a matter of law. *Sanders,* 217 S.W.3d at 15; *see Loram Maint. of Way, Inc. v. Ianni,* 210 S.W.3d 593, 598 n. 5 (Tex.2006) ("[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question.") (quoting *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990)).

### 1. *General Rule: No Duty to Prevent Harm to Others*

■ Persons generally have no duty to control the conduct of third parties. *Loram Maint.,* 210 S.W.3d at 596; *Tex. Home Mgmt., Inc. v. Peavy,* 89 S.W.3d 30, 34 (Tex.2002) (citing *Greater Houston Transp. Co.,* 801 S.W.2d at 525); *see Barton v. Whataburger, Inc.,* 276 S.W.3d 456, 462 (Tex.App.-Houston [1st Dist.] 2008, pet. filed) (stating rule in context of criminal conduct). Unless the danger to the claimant is shown to be foreseeable, the conduct of the third party, including criminal conduct, is deemed a superseding cause of the injury resulting from the danger. *See Phan Son Van v. Pena,* 990 S.W.2d 751, 753 (Tex.1999); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 550 (Tex.1985); *Barton,* 276 S.W.3d at 462.

■ An exception to this general rule applies when a special relationship exists between an actor and another that imposes a duty on the actor to control the other's conduct. *See Tex. Home Mgmt.,* 89 S.W.3d at 34 (citing *Greater Houston Transp.,* 801 S.W.2d at 525). But even when a special relationship exists, courts will not impose a duty unless the risk of harm is foreseeable, *see id.* at 36, because

a person has "'neither a legal nor [a] moral obligation to guard against that which cannot be foreseen.'" *Id.* (quoting *Houston Lighting & Power Co. v. Brooks,* 161 Tex. 32, 336 S.W.2d 603, 606 (Tex. 1960)) (quoting *Tex. & P. Ry. Co. v. Bigham,* 90 Tex. 223, 38 S.W. 162, 163 (1896)); *see also Carey v. Pure Distrib. Corp.,* 133 Tex. 31, 124 S.W.2d 847, 849 (1939) (stating that no liability will be imposed for allegation of negligence unless allegedly negligent party "ought to have foreseen the consequences" of act in "light of the attendant circumstances").

### 2. *Risk–Utility Inquiry Determines Duty*

■ Settled law recognizes that when courts determine whether a duty exists, they must "consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Madison,* 241 S.W.3d at 152 (citing *Mission Petroleum Carriers, Inc. v. Solomon,* 106 S.W.3d 705, 710 (Tex.2003); *Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604, 607 (Tex.2002)) (referring to this balancing of factors as risk-utility analysis). Foreseeability of the risk, however, is the "foremost and dominant consideration" in the duty analysis. *Tex. Home Mgmt.,* 89 S.W.3d at 36 (quoting *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987)); *Madison,* 241 S.W.3d at 152.

### 3. *"Mere Possibility" is Not Reasonable Foreseeability*

■ Foreseeability requires that defendant foresee only the general danger; the plaintiff need not establish that the defendant could foresee the exact sequence of events that produced the harm. *Mellon*

*Mortgage Co. v. Holder,* 5 S.W.3d 654, 655 (Tex.1999); *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996); *Nixon,* 690 S.W.2d at 551. As stated in the trial court's judgment, foreseeability is not determined by hindsight, but by what the defendant knew or should have known when the incident occurred. *See Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 757 (Tex.1998). Thus, the Harrises' having acknowledged, in retrospect, unwise choices regarding U.N. does not raise a material issue of fact regarding what they knew or should have known before the assault. *See id.*

■ Likewise, foreseeability analysis does not consider what simply *might* occur, because this inquiry would necessarily give rise to a universal duty to prevent harm, which the law does not impose. *Id.* at 756. Accordingly, a two-pronged test determines foreseeability of injury for purposes of determining the defendant's duty, as follows: (1) the injury must be of such a general character as might reasonably have been anticipated and (2) the plaintiff should be so situated with relation to the wrongful act that injury to him or one similarly situated might reasonably have been foreseen.[2] *Madison,* 241 S.W.3d at 152 (citing *Mellon Mortgage,* 5 S.W.3d at 655; *Nixon,* 690 S.W.2d at 551).

### 4. *Sanders & Madison: Danger Not Reasonably Foreseeable*

■ This Court recently applied these principles in *Sanders v. Herold* and in *Madison v. Williamson.* Despite the special relationship between a teenager and his parents, we held in *Sanders* that

the teenager's parents owed no duty to a child whom the teenager molested in the parents' home because the parents established as a matter of law that they were not aware of their son's dangerous tendencies and could not anticipate the danger that he posed to other children. *See Sanders,* 217 S.W.3d at 17–19.[3] As in this case, the parents learned about earlier abusive conduct only after their son had been arrested for the assault on the plaintiffs' child. *Id.* at 18. Because the parents had no knowledge of the earlier abusive conduct, even though it had occurred in their home, the parents could not "reasonably anticipate" their son's "dangerous tendencies." *See id.* at 15, 18 (citing and quoting *Rodriguez v. Spencer,* 902 S.W.2d 37, 42 (Tex.App.-Houston [1st Dist.] 1995, no writ)). As we explained in *Rodriguez,* the duty of a parent to protect a third party from injurious acts by the parent's minor child "depends on whether the injury to the third party is reasonably foreseeable under the circumstances, as evidenced by the parents' knowledge, consent, sanction, or participation in the child's activities." 902 S.W.2d at 43. *Compare Cain v. Cain,* 870 S.W.2d 676, 680–81 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (holding that uncle owed duty to niece to prevent sexual assault by uncle's son-in-law because uncle was aware of son-in-law's guilty plea to offense of sexual assault of child and could thus reasonably foresee similar assault on niece).

In *Sanders,* the Herolds also knew that their son had voyeuristic tendencies when he was four and five years old and were aware, when he was a teenager, that he

---

**2.** Foreseeability is also a component of the proximate cause element of a negligence claim. *Mellon Mortgage Co. v. Holder,* 5 S.W.3d 654, 655–56 (Tex.1999).

**3.** Our analysis encompasses *Sanders v. Herold,* which addressed duty in the context of

the special relationship between parent and child, because the trial court in this case assumed for purposes of its analysis, but did not decide, that the relationship between foster parent and foster child was also a special relationship.

enjoyed the company of younger children and viewed pornography; the Herolds also conceded that their son "was raised in a household where sexual topics were frequently discussed in front of the children." *Sanders,* 217 S.W.3d at 18. Yet, there was no summary-judgment evidence that the son's voyeurism continued through his childhood and into his teenage years; that the pornography that he viewed included child pornography; or that his enjoyment of the company of younger children was deviant. *Id.* at 18–19. Because the parents were thus not aware that their son was dangerous, they had no duty to warn the Sanderses that he was dangerous. *Id.* at 19.

Applying the same analysis in the context of a no-evidence summary judgment rendered pursuant to Rule of Civil Procedure 166a(i), we further held in *Madison* that a wife had no duty to prevent her husband from committing a sexual assault against a minor child in their home. 241 S.W.3d at 153. As in *Sanders,* there was no competent summary-judgment evidence that the wife should have foreseen that her husband would engage in inappropriate sexual contact in their home. *See id.*

In both *Sanders* and *Madison,* the defendant family members lacked the knowledge of prior incidents of criminal behavior on which the supreme court relied in *Texas Home Management.* *See* 89 S.W.3d at 38–39 (holding that owner and manager of mental health and mental retardation facility could reasonably foresee danger to family members by facility resident whom facility's interdisciplinary team permitted unsupervised, out-of-town home visits). Because the facility knew of the resident's lengthy history of assaults, theft, and weapons violations, the *Texas Home Management* court held that the facility failed to establish as a matter of law that it could not reasonably foresee the danger that the resident would murder a family member while released from the facility for a home visit. *See id.* at 36–39 (citing *Greater Houston Transp.,* 801 S.W.2d at 526).

### C. Duty Analysis in This Case

In contrast to the demonstrated knowledge of the perpetrator's dangerous tendencies that supported a duty owed as a matter of law in *Texas Home Management,* and much like the comparable lack of knowledge of the perpetrators' dangerous tendencies shown by the circumstances of the *Sanders* and *Madison* cases, the summary-judgment record of this case does not establish that the Harrises and Spaulding could reasonably foresee a danger that U.N. would assault A.V.

Like the Harrises, Spaulding representatives were incredulous when they learned about the incident with A.V. The Harrises also expressed disbelief when a second foster child informed that U.N. had also assaulted her. As a Spaulding representative reported, though the Harrises had permitted U.N. to be unsupervised upstairs in the group home, he had gained their trust over the four years that he had spent as their foster child, to the extent that they were considering adopting him. He had never acted in a sexually inappropriate manner with anyone, and he did not use sexually explicit or suggestive language. In short, U.N. had never displayed any behavior that suggested that he would sexually assault anyone. Likewise, nothing in his personal history or progress notes suggested a likelihood of his sexually assaulting A.V. We note further that Dyess confirmed that he was not aware of any evidence that either the Harrises or Spaulding knew or should have known that U.N. would commit a sexual assault or that he was dangerous.

Under the record presented, we hold that the sexual assault on A.V. was not of such a general character that the Harrises

or Spaulding might reasonably have anticipated it; we further hold that A.V. was not situated, with relation to the assault by U.N., in such a way that the Harrises or Spaulding might reasonably have foreseen that U.N. would sexually assault her or someone similarly situated to her. *See Mellon Mortgage,* 5 S.W.3d at 655; *Nixon,* 690 S.W.2d at 551; *Madison,* 241 S.W.3d at 152. Because neither the Harrises nor Spaulding could reasonably have foreseen the assault, the trial court properly rendered traditional summary judgment in favor of them on the ground that they had no duty to prevent U.N.'s sexual assault of A.V.

We overrule Dyess's issue.

## CONCLUSION

We affirm the judgment of the trial court.

Justice SHARP, dissenting.

JIM SHARP, Justice, corrected dissenting opinion.

My dissenting opinion of October 16, 2009, is withdrawn, and this one substituted in its place.

I dissent. The trial court preemptively usurped the jury's fact-finding role.

By the time that U.N. was 10 years old, a number of life's most twisted situations had already been visited upon him. His biological father was convicted of raping his sister. He and his younger brother were placed into the Harrises' 2,160 square foot foster home. He missed his mother.

By April 2005, at age thirteen, U.N. was described by Donna Harris as possessed of "the teenager hormones and he wants to be left alone and by himself now .... he is very moody." Leon Harris, too, noted U.N.'s maturation and acknowledged his understanding that thirteen is the age at which boys begin to seek sexual intercourse. Close to this same period, written reports of Spaulding's own foster care coordinator confirm that Leon Harris had walked in on "a boy (who) had [G.] bent over with both of their underwear down." As such, Leon Harris had approximately one year of advance notice that there was an issue with the foster children under his care acting out sexually.

Shortly after U.N.'s placement by Spaulding in the Harrises' home (originally authorized to house between one and five children), the Harrises built their "dream home" and were approved to house eight foster children. The extra room to roam (4,847 square foot/$400,000) also enabled extra payments to the Harrises by Spaulding for Children. It stands to reason that this increased area also made supervision of so many children a more far-flung proposition.

The trial court acknowledged that Dyess's summary-judgment evidence included the foster family's living arrangements, where six to eight children of mixed ages (infants to the age of 19) and genders lived upstairs from the foster parents. The trial court also acknowledged that U.N. had "free reign" of the upstairs, where a group of unrelated boys and girls of varying ages lived, slept, dressed, bathed, etc., largely unsupervised.

Common sense or the most rudimentary familiarity with pubescent, unrelated boys and girls would dictate that such an arrangement far exceeded mere foreseeability: it was well-nigh certain to foster activity as innocently exploratory as "Let's Play Doctor" and as tragic as the sexual penetration of a little six-year-old girl by an unquestionably unguided, unsupervised, deeply confused fourteen-year-old boy beset by "teenager hormones."

The trial court's order granting the motions for traditional summary judgment recites, "[T]he question is whether it was foreseeable that this *specific foster child* would act in such a heinous manner or some generally similar manner." (Emphasis added.) Foreseeability, however, requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 655 (Tex.1999). The two-prong test for foreseeability articulated by the Supreme Court of Texas is (1) that the injury be of such a general character as might reasonably be anticipated and (2) that the injured party should be so situated with relation to the wrongful act that injury to him or one similarly situated might reasonably have been foreseen. *Id.*

In order to prevail on their traditional motion for summary judgment on the element of duty, the Harrises and Spaulding were required to show that there was no genuine issue of material fact regarding the foreseeability of the risk of harm to A.V. *See* Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548 (Tex.1985). Evidence raises a genuine issue of material fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755–58 (Tex. 2007).

In light of all of the evidence presented at summary judgment—viewed in the light most favorable to Dyess, indulging every reasonable inference in his favor, and resolving any doubts against the Harrises and Spaulding—reasonable and fair-minded jurors could differ in their conclusions as to whether the risk of harm to A.V. was foreseeable and, therefore, whether the Harrises and Spaulding had a duty to prevent the assault by U.N. The rendering of summary judgment was thus improper. I would sustain Dyess's issue regarding foreseeability, reverse the trial court's take-nothing summary judgment, and remand the case to the trial court for further proceedings.